UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CRYSTAL THOMAS, et al.,

                Plaintiffs,                Case No. 19-11046

v.                                  Honorable Thomas L. Ludington

NATHANIAL FARR, et al.,

                Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs filed their complaint on April 10, 2019 alleging unlawful detainment of Plaintiff

Crystal Thomas, unlawful detainment of Plaintiffs Mr. Ford, LT 1, and LT 2, Thomas' sons, and

unreasonable search of their home. ECF No. 1. The alleged detainment and search occurred on

November 30–December 1, 2018. The original complaint named Aaron Bauman and John Doe

Michigan State Police Officers 1-20 as Defendants. *Id.* at PageID.1. Defendant Aaron Bauman

filed a motion to dismiss on June 14, 2019 and Plaintiffs filed an amended complaint on July 5,

2019. The amended complaint did not list Defendant Bauman as a defendant. Accordingly,

Defendant Bauman's motion to dismiss was granted on July 9, 2019. ECF No. 9.

Plaintiffs' amended complaint named the following Defendants: Nathanial Farr, Trooper

Wickersham, Kelly Lambert, Sergeant Lewis, Trooper Hoffman, Trooper Zecina, Trooper Taylor,

Trooper Lubelan, Trooper Pinkerton, Trooper Miller, Lieutenant McComb, William Ardnt,

Lieutenant Sosinki, and David Murchie. ECF No. 8.[1] Plaintiffs allege three claims. In Count I,

---

[1] Some titles and names of Defendants are missing or spelled incorrectly in the caption of the amended complaint. According to Defendants' affidavits. The correct info is: Detective Nathanial Farr, Trooper Elizabeth Wickersham, Trooper Kelly Lambert, Squad Sergeant Dan Lewis, Sergeant Derek Hoffman, Sergeant Robert Ziecina, Trooper

Plaintiff Thomas alleges she was unlawfully detained in violation of the Fourth Amendment by Defendants Farr and Wickersham. In Count II, Plaintiffs Ford, LT 1, and LT 2 allege they were unlawfully detained by Defendants Miller, Pinkerton, Lubelan, Taylor, Zecina, Hoffman, Murchie, Lewis, Lambert, Arndt, Sosinki, and McComb. In Count III, all Plaintiffs allege their Fourth Amendment right to be free from unreasonable searches was violated by Defendants Miller, Pinkerton, Lubelan, Taylor, Zecina, Hoffman, Lewis, Lambert, Ardnt, Sosinki, and McComb. Defendants answered the amended complaint on October 21, 2019 and filed a motion for summary judgment based on qualified immunity on October 25, 2019. ECF Nos. 19, 21. The response and reply were timely filed. ECF Nos. 24, 26. By way of background, discovery is to be completed by May 5, 2020, the dispositive motion deadline is June 5, 2020, and jury trial is set for October 13, 2020. ECF No. 25. As explained below, Defendants' motion for summary judgment for qualified immunity will be granted in part and denied in part.

## I.

Defendants filed a motion for summary judgment seeking a determination of qualified immunity. To date, no discovery has occurred. ECF No. 24 at PageID.335. Accordingly, the following facts are based on police reports and affidavits submitted by Plaintiffs and Defendants as exhibits to the motion, response, and reply. On November 28, 2018, Saginaw County and Michigan State Police Troopers responded to an armed robbery call. Victims, KMY and JDU[2] explained they planned to meet with DMF[3] at a barbershop in Saginaw to purchase a gun from him. ECF No. 21-2 at PageID.212-214. Instead, DMF used the gun to rob KMY and JDU. *Id.* The

---

Casey Taylor, Trooper Daniel Lubelan, Trooper Andrew Pinkerton, Trooper Derek Miller First Lieutenant Brian McComb, Detective Sergeant William Ardnt, David Sosinki, and Detective Trooper David Murchie.

[2] Both victims were minors at the time of the incident. Even though their full names are provided in the police reports, their initials will be used for this order. Neither is a party in this case.

[3] DMF was also a minor at the time the events occurred, so his initials will be used as well. He is not a party in this case.

victims identified DMF as the suspect in a photo line-up and Saginaw County District Judge Fichtner authorized a search warrant for DMF on November 30, 2018 at his last known address. *Id.* at PageID.212, 220. DMF's last known address was his mother's house. ECF No. 21 at PageID.184.

## A.

Saginaw County Probation officer Keith Pretzer advised Sergeant Rivard "that [DMF] was on probation for strong armed robbery which occurred in September 2018. His bond was paid by his mother and he was released. He was no longer attending school and had absconded from probation resulting in a warrant for his arrest." *Id.* at PageID.219. Sergeant Arndt "completed a Warrant Service Risk Assessment Matrix . . . with a score of 95" (out of 100). *Id.* at PageID.220. A score of 31 is considered high risk. ECF No. 21-4 at PageID.237. "Due to the high risk of the suspect being armed and his previous criminal history, the Michigan State Police Emergency Support Team ['E.S. Team'] was activated" to execute the search warrant. *Id.* at PageID.212. The search warrant identified DMF and

> all firearms (including ammunition, firearms cases/boxes, cleaning kits); documents that establish or tend to establish an ownership and or possessory and or occupancy link by any person to the above described location; cellular telephones and or computers and or data storage devices and the contents of such devices as well as any and all passwords or encryption codes associated with such devices; photographs that establish any possession and or use or [sic] a firearm; forensic evidence to include but not be limited to spent shell casings, and fired bullets; and any clothing described as Nike brand gray sweatpants and sweatshirt style clothes; and any vehicle present, or arrive during, the execution of the warrant; including any photographs of the interior and exterior of the above location.
> ECF No. 21-3 at PageID.232.

## B.

Detectives conducted surveillance of the property and of DMF's mother, Crystal Thomas. Trooper Farr followed Plaintiff Thomas from her work to a residence on Maplewood Avenue

around 2:30 p.m. on November 30, 2018. ECF No. 21-2 at PageID.220. Trooper Farr declared that he "did [ ] trail Plaintiff Thomas in an unmarked vehicle until other officers arrived and pulled her over." ECF No. 21-7 at PageID.250. The residence was Plaintiff Thomas' sister's house. ECF No. 24-3 at PageID.375. Trooper Wickersham stated that she "approached Plaintiff Thomas after she had pulled up to a curb in front of a house and exited her vehicle. [ ] We did not pull her over. [ ] We did not engage our flashing overhead lights." ECF No. 21-6 at PageID.248. Detective Trooper Murchie provided a similar declaration. "To avoid Thomas tipping off her son [DMF], detectives conducted surveillance and I made contact with Thomas shortly after she left work at 2:30 p.m. [ ] My partner, Tpr. Wickersham, and I approached Plaintiff Thomas after she had pulled into the driveway of a house and exited her vehicle. I told her about the case and that her son was wanted in connection with an armed robbery." ECF No. 21-8 at PageID.253-255.

**C.**

According to Detective Trooper Murchie, "Plaintiff Thomas agreed to speak with me about her son. [ ] I requested Plaintiff Thomas wait with me while other officers began preparing to execute a search warrant at her residence. She agreed to wait with me. [ ] She was cooperative and answered questions freely." ECF No. 21-8 at PageID.253-255. She was in an "unmarked state vehicle, unhandcuffed, and we waited for the Emergency Support team ('ES team') to complete work at Plaintiff Thomas's residence." *Id.* at PageID.255. A police report investigated by Detective Trooper Murchie states that Ms. Thomas "was detained to prevent her from going to her home and from calling the suspect to tip him off. I secured [Ms. Thomas] inside my unmarked vehicle." ECF No. 21-2 at PageID.220. According to Detective Trooper Murchie, "[s]he did not ask to leave or demand to leave while [they] waited." ECF No. 21-8 at PageID.255. That said, Plaintiff Thomas

was not allowed to return to her residence during which the search warrant was being executed. *Id.*

In contrast to Murchie's affidavit, Ms. Thomas declared she was told "you're being detained . . . your son committed an armed robbery" and she was asked to get in the front seat of a police vehicle. ECF No. 24-3 at PageID.375. She felt that she did not have another option than to go with the police officers. ECF No. 24-3 at PageID.375. At some point, they moved locations from the street outside Thomas' sister's house to a parking lot "at an abandoned school." *Id.* Ms. Thomas explained to police that she had not seen her son, DMF, for a few days and expressed concerns that he "has been acting out and hanging out with bad kids." ECF No. 21-2 at PageID.220; ECF No. 24-3 at PageID.375. She informed the police she has three other children at home, a 12 year old, a 15 year old, and a 19 year old. ECF No. 21-2 at PageID.220. She also explained that DMF does not want to return to juvenile detention and she did not think he would surrender to police. *Id.* DMF called Thomas while Thomas was in the police vehicle and she told him to turn himself in. ECF No. 24-3 at PageID.375. She also stated that an officer said her son's cell phone location had been tracked to the other side of Saginaw from her home. ECF No. 24-3 at PageID.375. Defendants contest this point in their reply. ECF No. 26 at PageID.391.

Thomas asserted she offered the police officers a key to her house, but was told "they had certain protocol they have to follow, which would entail smashing out the windows of my home and breaking down the doors." ECF No. 24-3 at PageID.376. Trooper Casey Taylor, a member of the E.S. Team, attested that a "key was not available to us because Plaintiff Thomas refused to return to the scene or answer calls from police and was uncooperative." ECF No. 21-14 at PageID.299. Regardless, "a key to make entry would not have been safe because [they] had reason to believe the target suspect was armed and barricaded inside of the residence." ECF No. 21-14 at

PageID.299. It is unclear what Trooper Taylor bases her affidavit on because Thomas was with police officers from 2:30 p.m. before the search warrant was executed until hours later when she was allowed to leave the police station with her sons on the condition that she did not return home until after the search was complete. Therefore, Trooper Taylor's statements that Plaintiff Thomas "refused to return to the scene" is illogical because she was told she could not return to the house. Also, Taylor's statement that Thomas "refused to . . . answer calls from police" contradicts other police officers' affidavits that Plaintiff Thomas was with police officers before and during the beginning of the search. Therefore, the police would not need to call Plaintiff Thomas to speak with her because she was already with police officers.

Overall, Plaintiff Thomas was questioned for 30 minutes in the school parking lot. ECF No. 24-3 at PageID.376. Then she was brought to the Buena Vista police station, left inside the police vehicle for 45 minutes at the station, and then reunited with her children inside the station. *Id.* Detective Trooper Murchie explained he "brought" Thomas to the Buena Vista Police Department, which presumably means he drove her in the police vehicle. It is unclear what happened to Thomas' personal vehicle when she was brought to the police station.

**D.**

Around 3:30 p.m. Defendants executed the search warrant at Thomas' home with the knowledge that three of her children were at home. ECF No. 21-2 at PageID.221. The E.S. Team who executed the search warrant "conduct[ed] a surround-and-callout based on the likelihood of children present inside the residence." ECF No. 21-2 at PageID.222. Three males exited the residence and "were detained." *Id.* Mr. Ford "was wearing basketball shorts, no shirt, and slide-on sandals" and was handcuffed immediately after exiting the house. LT 1 and LT 2 were wearing "basketball shorts, slide-on sandals, and T-shirts with no coats." ECF No. 24-2 at PageID.371. LT

1, who was 15,[4] was handcuffed but they did not have a third set of handcuffs to put on LT 2, the 12 year old. ECF No. 24-2 at PageID.371; ECF No. 24-3 at PageID.375. Squad Sergeant Lewis asserted that "[a]ll three subjects were ordered back to the cover of the Bearcat, for their safety and [that of the team], where they were detained and searched. [ ] All three subjects were placed inside the warm Bearcat upon being detained." ECF No. 21-13 at PageID.2953. The males were initially "detained inside the Bearcat" and then transported "over to a Buena Vista PD vehicle . . . where they were turned over to be taken to MSP detectives." ECF No. 21-9 at PageID.278; ECF No. 21-13 at PageID.295. Plaintiffs allege they were kept in the cold in t-shirts and slide on shoes when it was 32 degrees outside. ECF No. 24-2 at PageID.371.

There is conflicting information about what information E.S. Team members had regarding DMF's presence in the home. Trooper Miller "receive[d] the individuals as they exited Plaintiff Thomas's residence and search[ed] them." ECF No. 21-10 at PageID.284. He recalls one of the three males "tell [him] that his brother was in the residence" and a different male "telling [him] that he was not sure how many people remained in the residence." ECF No. 21-10 at PageID.285. Trooper Pinkerton declared that "[t]he three subjects provided conflicting information as to the whereabouts of the target suspect. This led the REACT team[5] to believe he was still inside the residence." ECF No. 21-11 at PageID.289. Additionally, "other REACT team members communicated to the team that they observed a subject still inside the residence." ECF No. 21-11 at PageID.289; ECF No. 21-12 at PageID.292.

The E.S. Team's assertions conflict with Plaintiff Ford's declaration that the "police asked us if our other brother [DMF] was inside the house, and I told them several times, no, he was not

---

[4] Mr. Ford's affidavit says LT 1 was 14 at the time of the incident, but Ms. Thomas' affidavit provides the date of birth for her children and LT 1 would have been 15 at the time.
[5] Defendants do not provide a definition of "REACT team," but based on Defendant Pinkerton's affidavit, he appears to be referring to other members of the E.S. Team.

in the house, and that we hadn't seen him in over a week." ECF No. 24-2 at PageID.371. Mr. Ford further stated that he was threatened with jail for harboring a fugitive and lying to police if they found his brother. ECF No. 24-2 at PageID.372. He attested that LT 1 and LT 2 also told officers that DMF had not been at the house in over a week and they did not know where he was. ECF No. 24-2 at PageID.372. Mr. Ford also stated a police officer told him that "if we end up in a shootout with your brother and he dies, that's on you." ECF No. 24-2 at PageID.372.

**E.**

Mr. Ford declared that he was detained during the search warrant and was not free to leave. ECF No. 24-2 at PageID.372. He stated "the police took my brothers and I to the Buena Vista police station where we were brought to a room where my mother had been detained, and we were questioned further about my brother" for an hour and a half before being told they were allowed to leave with their Mother. ECF No. 24-2 at PageID.372; ECF No. 24-3 at PageID.376. Detective Trooper Murchie stated that the males' handcuffs were removed once they arrived at the police station. ECF No. 21-8 at PageID.255. Murchie asserted that after the three males were driven to the police station, he asked them "if [DMF] was inside the house so [the search warrant] could end peacefully and with the least amount of damage to the home as possible." ECF No. 21-8 at PageID.256. He was told DMF was not home. ECF No. 21-8 at PageID.256. All four Plaintiffs were allowed to leave the police station but were not permitted to return home due to the ongoing search. ECF No. 21-8 at PageID.256.

**F.**

Before the officers entered the house, "chemical munitions, MSP robots, and other tools and tactics, [were used] in an attempt to persuade the suspect to exit the residence." ECF No. 21-2 at PageID.22. The timeline provided in the E.S. Team police report states "SL6 rounds (6) – 2

to south windows, 2 to southeast, 2 to southwest," "SL6 rounds," "gas – 6 rounds with announcements, east side, far east window," "6 OC rounds, south side, through window," "6 OC rounds, south side," "Bear cat dropping off [gas] injector", "robot through window," "CS Gas through northeast window," "another round deployed (4 rounds)," and "broke out window for robot." ECF No. 21-9 at PageID.281-282. No further explanation was provided.

### G.

After the residence was breached, "E.S. Team members and a tactical K-9's entered the residence and determined the suspect was not present." ECF No. 21-2 at PageID.222. The police report by Detective Trooper Murchie also states "due to the extensive damage of the residence and the hazard from the chemical munitions detectives were only able to conduct a brief/cursory search of the residence." ECF No. 21-2 at PageID.223. As part of the search, a cut saw was used on the floor because "[i]t appeared there was a void in the crawl space that [the E.S. Team] could not see so the only way to consider the house totally clear was to confirm by cutting into the floor and look into the crawl space." ECF No. 21-12 at PageID.292. Sergeant Ziecina declared that he moved "dressers and other items that had been knocked over by the armored vehicle's ram on the secondary search." ECF No. 21-18 at PageID.311. Detective Trooper Farr "assisted other officers in searching the home pursuant to search warrant" and "searched the home for weapons used in an armed robbery the target suspect was suspected to have committed." ECF No. 21-7 at PageID.251. Two items were seized as a result of the search warrant, "(1) black pistol holster (2) 2 gold in color bullets." ECF No. 21-3 at PageID.235.

### H.

Detective Trooper Murchie's report indicates "extensive damage" to the property, including "siding, walls, windows, doors, floors, and contents." ECF No. 21-2 at PageID.223. Two

troopers took photos of the damage and they were uploaded to "the crime scene repository." *Id.*

The E.S. Team report explains there was "extensive damage to the south side of the residence from breaking out windows utilizing the bearcat. Also, extensive damage to window glass on north, south and east sides. Plus, damage to floor by using the cut saw to gain access to hidden crawl space area." ECF No. 21-9 at PageID.282. The report notes that "[p]hotographs were taken and uploaded to Digital Crime Scene." *Id.* Squad Sergeant Lewis declared that "[n]early all damage to the residence resulted from a series of progressive tactical actions taken in an attempt to encourage the target suspect to exit the residence prior to the team making entry. . . . The only damage resulting from the actual search of the residence . . . was the use of a cut saw to open a space into what appeared to be a void or opening under a step down into a bedroom." ECF No. 21-13 at PageID.295-296. Defendants did not include pictures of the residence in their motion or reply.

Plaintiffs' response included nine pictures. The pictures show broken glass and window screens on the floor next to boarded up plywood in the opening where a window once was. ECF No. 24-1 at PageID.361. The pictures also show exposed interior wall studs, although it is unclear if the studs were exposed before the search warrant. ECF No. 21-1 at PageID.361. There are pictures of a bathroom that is structurally intact but it appears that the contents of a linen closet were emptied onto the floor. Pictures of a living room and bedroom show broken blinds, boarded up windows, and overturned furniture. ECF No. 21-1 at PageID.362, 363, 365. There is a picture of the kitchen with a significant portion of the wall knocked down and a broken sliding door, insulation, and drywall covering the entire kitchen floor. ECF No. 21-1 at PageID.367. There are also at least two rooms with boarded up windows where light can be seen shining through, indicating the boards may not fully cover the broken windows. ECF No. 24-1 at PageID.364, 366, 367. The picture of the front of the house shows the door and the two front windows boarded up.

ECF No. 24-1 at PageID.368. The back of the house has a portion of the wall that was completely destroyed and is half covered with plywood and half exposed insulation and support beams. ECF No. 24-1 at PageID.369.

# I.

The residence was finally secured and police and third party Hammer Restoration left the scene around 5:30 a.m. on December 1, 2018.[6] ECF No. 21-2 at PageID.223. Plaintiff Thomas returned to her home at 6:00 a.m. on December 1, 2018 and "saw that the home was completely destroyed, with windows smashed out, doors knocked in, and the interior of [the] house in shambles. The home was not livable, and several of [her] belongings were damaged or destroyed." ECF No. 24-3 at PageID.376. She also attached a list of $15,900 worth of property she stated was damaged or destroyed during the search. ECF No. 24-3 at PageID.377-378.

Two days later, Lieutenant McComb "contacted the homeowner Velma Roach and her husband Malcolm [who] advised the residence was covered by AAA Insurance." ECF No. 21-2 at PageID.223. On December 14, 2018, MSP's E.S. Team executed a second search warrant at a different location and DMF was arrested. ECF No. 21-2 at PageID.224.

# II.

Defendants argue they are entitled to qualified immunity on all three claims. A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

---

[6] Some police officers refer to the dates in question as November 30 and November 31, 2018. *See e.g.*, ECF No. 21-5 at PageID.239. However, November only has 30 days. Therefore, any reference to November 31, 2018 will be construed to mean December 1, 2018.

*Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

The existence of qualified immunity depends on whether a defendant's actions violated clearly established law. *Id.* at 243–44. "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Id.* at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The Court has discretion regarding the sequence with which to conduct the analysis. *Pearson*, 555 U.S. at 236. Thus, the Court may hold that a right is not clearly

established law without first analyzing whether the relevant facts actually establish a constitutional violation. *Id.* Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). The relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

## A.

Plaintiffs Ford, LT 1, and LT 2 alleged that their Fourth Amendment right to be free from unreasonable seizures was violated when they were (1) detained, handcuffed, and interrogated outside their home and then (2) subject to additional detainment and interrogation by Defendant Murchie. ECF No. 8 at PageID.70-72. Plaintiffs name Defendants Miller, Pinkerton, Lubelan, Taylor, Zecina, Hoffman, Murchie, Lewis, Lambert, Arndt, Sosinki, and McComb as Defendants in Count II. *Id.* at PageID.70. Defendants frame the constitutional question as whether "[w]hile executing a valid search warrant, law enforcement officers do not violate an individual's Fourth Amendment rights to be free of unlawful seizures if the officers remove and detain the individual during the duration of the search." ECF No. 21 at PageID.181. Plaintiffs' claim is broader than Defendants suggest. Plaintiffs' claim that their right to be free from unreasonable seizures was violated both at their house during the execution of the search warrant and after they were removed from the property and detained and questioned by Detective Trooper Murchie. The two theories of the claim will be analyzed separately.

**i.**

The first part of the analysis is whether Plaintiffs have a clearly established constitutional right. The Fourth Amendment guarantees individuals the right to be free from unreasonable seizures. Specifically, it says "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Court clearly stated that "it must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 17 (1968). Accordingly, the "police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." *Terry v. Ohio*, 392 U.S. 1, 21 (1968) (citations omitted). However, there are multiple exceptions to the rule, including consensual encounters with police and Terry stops. *See Florida v. Bostick*, 501 U.S. 429, 437–40 (1991); *Terry v. Ohio*, 392 U.S. 1, 21 (1968).

Another exception is that occupants may be temporarily detained during the execution of a search warrant. *Florida v. Royer*, 460 U.S. 491, 189–99 (1983) (citing *Michigan v. Summers*, 452 U.S. 692 (1981)). The Supreme Court has "recognized that 'law enforcement officials have a limited authority to detain occupants of a premises while a proper search is being conducted.'" *Duncan v. Jackson*, 243 F. App'x 890, 896 (6th Cir. 2007) (quoting *United States v. Bohannon*, 225 F.3d 615, 616 (6th Cir. 2000)). The Supreme Court has explained that "[i]n assessing the justification for the detention of an occupant of premises being searched for contraband pursuant to a valid warrant, both the law enforcement interest and the nature of the 'articulable facts' supporting the detention are relevant. Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers." *Michigan v.*

*Summers*, 452 U.S. 692, 702 (1981). The Court later summarized a list of "law enforcement interests that provide substantial justification for detaining an occupant: 'preventing flight in the event that incriminating evidence is found'; 'minimizing the risk of harm to the officers'; and facilitating 'the orderly completion of the search,' as detainees' 'self-interest may induce them to open locked doors or locked containers to avoid the use of force.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005). "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.'" *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Michigan v. Summers*, 452 U.S. 692, 705 n.19 (2005)).

The law enforcement officer's authority to detain also includes "the authority to use reasonable force to effectuate the detention," i.e., use handcuffs. *Muehler v. Mena*, 544 U.S. 93, 98–99 (2005); *Ramage v. Louisville/Jefferson Cty. Metro Gov't*, 520 F. App'x 341, 347 (6th Cir. 2013). An individual's presence in a house when a valid search warrant is executed is sufficient justification for police officers to detain and even handcuff the occupants temporarily. Additionally, the detention does not have to occur in silence. The Sixth Circuit has explained that "when officers execute a search warrant, they may question occupants during the search so long as the questioning does not prolong the search." *United States v. Binford*, 818 F.3d 261, 268 (6th Cir. 2016). Therefore, the law outlining Plaintiffs' right to be free from unreasonable seizures and the exception for detentions during search warrants is clearly established.

The second half of the analysis addresses whether the facts demonstrate that Plaintiffs rights were violated during the detention at the house. In this case, law enforcement obtained a search warrant for DMF and weapons at Plaintiffs' house. The three males were found at the house at the time of the search warrant's execution. The law clearly establishes that Plaintiffs traditionally

have a right to be free from unreasonable seizures, but it also is equally clear that law enforcement officers have the authority to detain and handcuff individuals found on the premises of a house being searched. Therefore, Plaintiffs' right to be free from unreasonable seizures is clearly established, but the detention by police officers falls into a clearly established exception for occupants during the execution of a search warrant. Accordingly, the law is actually clearly established that Plaintiffs did *not* have a right to be free from seizure at the house because of an exception to the Fourth Amendment in search warrant cases. There is no reason to review the facts regarding the detention of the male Plaintiffs at the house because the police officers are entitled to qualified immunity for their detention during the execution of the search warrant. Because those officers are entitled to qualified immunity on the claim regarding detention and questioning of the male Plaintiffs at house, Count II will be dismissed as against Defendants Miller, Pinkerton, Lubelon, Taylor, Zecina, Hoffman, Lewis, Lambert, Arndt, Sosinki, and McComb.

### ii.

The second half of Plaintiffs' Count II claim is whether their Fourth Amendment rights were violated during the ongoing detention and interrogation conducted by Detective Trooper Murchie away from the house. ECF No. 8 at PageID.71 ("Despite that they were not part of the investigation against their brother D.M.F., they were . . . [subject to] continued detainment and interrogation from Defendant Murchie.").

The same case law analyzed in Section II.A.i is applicable here. Plaintiffs have a Fourth Amendment right to be free from unreasonable seizures unless an exception applies. In addition, the Sixth Circuit has explained that "once the police officers removed [plaintiffs] from the home, probable cause was required to support their continued detentions." *Marcilis v. Township of Redford*, 693 F.3d 589, 603 (6th Cir. 2012). Therefore, Plaintiffs prevail on the first part of the

qualified immunity test—the law is clearly established that they have a right to be free of unreasonable seizures when they are not suspects for a crime and they are not present in or near a home where a search warrant is being executed.

In order to determine if Defendant Murchie is entitled to qualified immunity, he must establish that the facts show there is no constitutional violation. Here, discovery has not yet occurred, so there is little information regarding Detective Trooper Murchie's questioning of Plaintiffs. Both parties admit that by the time Detective Trooper Murchie detained and interrogated Plaintiffs, the male Plaintiffs were at the police station and no longer at the house where the search warrant was being conducted. ECF No. 21-8 at PageID.255–56; ECF No. 24-2 at PageID.372; ECF No. 8 at PageID.71. This information alone is sufficient to establish a potential violation of Plaintiffs' constitutional rights to be free from unreasonable seizures. Accordingly, Detective Trooper Murchie's motion for summary judgment based on qualified immunity on Count II will be denied without prejudice due to insufficient facts that he did not violate Plaintiffs' rights. *See Pecsi v. Doyle*, 1991 WL 137597 at *3 (6th Cir. 1991) ("Due to the undeveloped factual record in this case, we cannot conclude that the police officers deserved qualified immunity.").

**B.**

Plaintiff Thomas alleged that Defendants Farr and Wickersham detained her in violation of her Fourth Amendment rights. ECF No. 8 at PageID.67. Defendants sought to dismiss Defendant Wickersham due to her lack of personal involvement in detaining Plaintiff Thomas. ECF No. 21 at PageID.204. Plaintiff "concur[ed] in dismissal without prejudice for Defendant Wickersham only." ECF No. 24 at PageID.343. Accordingly, due to the agreement between the parties, Count I against Defendant Wickersham will be dismissed without prejudice. Because this is Plaintiffs sole claim against Wickersham, she will be dismissed as a defendant. ECF No. 8.

Defendant Farr claims she is also entitled to qualified immunity. Defendants claim Plaintiff "was briefly questioned . . . and voluntarily waited with Defendants" while the search warrant was executed at her home. ECF No. 21 at PageID.181. In this instance, Plaintiff Thomas had a constitutional right to be free from an unreasonable seizure when she was not suspected of criminal behavior and was not present at the scene of the search warrant. The first question in a qualified immunity analysis is whether Thomas' right was clearly established. As discussed earlier, Plaintiff Thomas has a clearly established right to be free from unreasonable seizure, especially when she is not suspected of criminal behavior and was not present at the house during the search warrant. *See supra* Subsection II.A.i.

The next question is whether Defendant Farr violated Plaintiff's constitutional rights when she was not a suspect of criminal behavior and not present at the scene of the search warrant. Defendant Farr averred he only tailed Thomas' vehicle in an unmarked vehicle. ECF No. 21-7 at PageID.250–51. Thomas, however, attested that two men were present in the vehicle in the parking lot and asked her questions. ECF No. 24-3 at PageID.375. Detective Trooper Murchie (who is not a listed defendant for this count) admits he was in the vehicle and asked Thomas questions. ECF No. 21-8 at PageID.254–55. Defendants have provided no further information regarding who else may or may not have been present in the police vehicle. It is also unclear whether Thomas consented to answering questions from police officers. There are insufficient facts about Defendant Farr's involvement to establish there is not a genuine issue of material fact that he did not violate Thomas' right to be free from unreasonable seizure. Accordingly, Defendant Farr's motion for summary judgment on Count I will be denied without prejudice.

**C.**

Third, all four Plaintiffs allege Defendants Miller, Pinkerton, Lubelan, Taylor, Zecina, Hoffman, Lewis, Lambert, Arndt, Sosinki, and McComb violated their Fourth Amendment right to be free from unreasonable searches. ECF No. 8 at PageID.72. Defendants frame the constitutional question as whether Defendants violated Plaintiffs' rights "to be free of unreasonable searches when a search is conducted pursuant to a valid search warrant [which] requires a showing that the officers conducting the search acted unreasonably given the circumstances," in this case, "us[ing] gas and robots to breach the home and subdue the [armed] gunman in order to execute a signed search warrant for the gunman and the house." ECF No. 21 at PageID.181.

The initial question for Defendants qualified immunity claim is whether Plaintiffs' rights to be free from unreasonable searches pursuant to a valid search warrant is clearly established. Defendants do not deny that the "right to be free from unreasonable searches and seizures is clearly established, and the reasonableness of a search or seizure is evaluated based on a totality of the circumstances." ECF No. 21 at PageID.199 (citations omitted); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *Terry v. Ohio*, 392 U.S. 1, 8–9 (1968). The Supreme Court has also held that "officers executing search warrants on occasion must damage property in order to perform their duty." *Dalia v. United States*, 441 U.S. 238, 258 (1979). However, "when officers have complied with the Warrant Clause in obtaining authorization for a search, that does not insulate the search from challenge." *Baranski v. Fifteen Unknown Agents of Bureau of Alcohol, Tobacco, & Firearms*, 452 F.3d 433, 445 (6th Cir. 2006). Additionally, "'the manner in which a warrant is executed'-including the damage of property-'is subject to later judicial review as to its reasonableness.'" *United States v. Whisnant*, 391 F. App'x 426, 429–30 (6th Cir. 2010) (quoting *Dalia v. United States*, 441 U.S. 238, 258 (1979)).

Plaintiffs have a clearly established right to have the search warrant executed in their home conducted in a reasonable manner, including any destruction of property. At this time, the only evidence available of the search are nine pictures from Plaintiffs showing significant damage to the property (ECF No. 24-1), multiple police reports describing the extensive damage (ECF No. 21-9 at PageID.282; ECF No. 21-8 at PageID.269), and one police officer who averred that most of the damage occurred in their efforts to encourage DMF to leave the house (ECF No. 21-13 at PageID.295). Defendants have not identified sufficient facts to conclude that the search was reasonable and therefore that they did not violate Plaintiffs' rights. Defendants' motion for summary judgment on qualified immunity as to Count III will be denied without prejudice.

### III.

Multiple Defendants requested that if their motion for summary judgment was not granted in full, that they be dismissed due to lack of personal involvement in the alleged detentions and unreasonable search. ECF No. 21 at PageID.204. The Sixth Circuit requires personal involvement to impose 1983 liability on law enforcement officers. *See Murphy v. Grenier*, 406 F. App'x 972, 974 (6th Cir. 2011); *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991). However, there are insufficient facts at this juncture to dismiss defendants due to lack of personal involvement before discovery has occurred. Defendants' motion for summary judgment based on insufficient personal involvement will be denied.

### IV.

Accordingly, it is hereby **ORDERED** that Defendants' motion for summary judgment, ECF No. 21, is **GRANTED IN PART AND DENIED IN PART WITHOUT PREJUDICE**.

As to Count I, it is **ORDERED** that Defendant Farr's motion for summary judgment is **DENIED WITHOUT PREJUDICE**.

It is further **ORDERED** that Count I is **DISMISSED WITHOUT PREJUDICE** as to Defendant Wickersham. Defendant Wickersham is dismissed as a defendant.

As to Count II, it is **ORDERED** that Defendants Miller, Pinkerton, Lubelon, Taylor, Zecina, Hoffman, Lewis, Lambert, Arndt, Sosinki, and McComb' motion for summary judgment is **GRANTED**. Count II will be **DISMISSED** against Defendants Miller, Pinkerton, Lubelon, Taylor, Zecina, Hoffman, Lewis, Lambert, Arndt, Sosinki, and McComb.

It is further **ORDERED** that Defendant Murchie's motion for summary judgment on Count II is **DENIED WITHOUT PREJUDICE**.

As to Count III, it is **ORDERED** that Defendants Miller, Pinkerton, Lubelan, Taylor, Zecina, Hoffman, Lewis, Lambert, Arndt, Sosinki, and McComb's motion for summary judgment is **DENIED WITHOUT PREJUDICE**.

Dated: February 11, 2020                          s/Thomas L. Ludington
                                                  THOMAS L. LUDINGTON
                                                  United States District Judge