UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CRYSTAL THOMAS, et al.,

                    Plaintiffs,                    Case No. 1:19-cv-11046

v.                                        Honorable Thomas L. Ludington
                                          United States District Judge

KELLY LAMBERT, et al.,

                    Defendants.

_____/

**OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR
RECONSIDERATION**

Defendants seek reconsideration of this Court's Order denying their Motion for Leave to

File a Second Motion for Summary Judgment. ECF No. 68. As explained hereafter, the Motion

for Reconsideration will be denied.

**I.**

**A.**

On November 30, 2018, Defendant Officers from the Saginaw County and Michigan State

Police went to Plaintiff Crystal Thomas's house to execute an arrest warrant for her 16-year-old

son, DF, who stole approximately $150 from two illegal-firearms dealers. *See Thomas v. Farr*,

No. 19-11046, 2020 WL 674342, at *1–5 (E.D. Mich. Feb. 11, 2020). The police followed her

from work in an unmarked vehicle, pulled her over, secured her, and took her to an abandoned

school where they questioned her about DF. *Id.* She offered Defendants a key to her house to check

for DF, but they replied that "they had certain protocol they have to follow, which would entail

smashing out the windows of [her] home and breaking down the doors." *Id.* (quoting ECF No.

24-3 at PageID.376).

In executing the arrest warrant for DF, Defendants destroyed about $16,000 worth of Plaintiffs' property. *See id.* After those efforts, Defendants transported Plaintiff Thomas's three children, and later Plaintiff Thomas, to the Buena Vista police station for questioning about DF, who did not live with Plaintiffs and was not present during the execution of the warrant. *Id.*

In April 2019, Plaintiffs filed a complaint alleging that Defendants unlawfully detained Plaintiff Thomas in a police cruiser in the parking lot of an abandoned school before the raid; that Defendants unlawfully detained Plaintiffs LT1, LT2, and Matthew Ford (Thomas's three sons) at their house during the raid and at the Buena Vista police station after the raid; and that Defendants unreasonably searched their house by, among other things, deploying robots and at least 28 gas bombs through the windows, slashing their floorboards with a chainsaw, and ramming the walls down with a 17,500 lb. armored vehicle named the Bearcat. *Id.* at *1; ECF Nos. 1; 44. The original complaint named Aaron Bauman and John Doe Michigan State Police Officers 1–20 as Defendants. *Farr*, 2020 WL 674342, at *1. Defendant Aaron Bauman filed a motion to dismiss on June 14, 2019. *Id.*

Plaintiffs filed an amended complaint on July 5, 2019. *Id.* The amended complaint did not identify Defendant Bauman, so he was dismissed on July 9, 2019. *Id.* (citing ECF No. 9). In Count I, Plaintiff Thomas alleged that Defendants Farr and Wickersham unlawfully detained her in violation of the Fourth Amendment. In Count II, Plaintiffs Ford, LT1, and LT2 alleged that they were unlawfully detained by Defendants Arndt, Hoffman, Lambert, Lewis, Lubelan, McComb, Miller, Murchie, Pinkerton, Sosinki, Taylor, and Ziecina. In Count III, all Plaintiffs alleged that their Fourth Amendment right to be free from unreasonable searches was violated by Defendants identified in Count II less Defendant Murchie. *Thomas v. Farr*, No. 19-11046, 2020 WL 674342,

at *1 (E.D. Mich. Feb. 11, 2020), *appeal dismissed sub nom. Thomas v. Bauman*, 835 F. App'x 5 (6th Cir. 2020).

## B.

On October 25, 2019, ten days before the parties submitted their Rule 23(f) discovery plan, Defendants filed a motion for summary judgment seeking qualified immunity on all three counts. ECF No. 21. Twenty-five days later, the first Scheduling Order was set with a May 5, 2020 discovery deadline. ECF No. 25. Less than three months later, Defendants' motion for summary judgment was denied and granted in part. *See generally Farr*, 2020 WL 674342.

Count I was dismissed without prejudice against Defendant Wickersham, retaining Defendant Farr. *Farr*, 2020 WL 674342, at *9–10; *see also id.* at *8 ("Plaintiff 'concur[ed] in dismissal without prejudice for Defendant Wickersham only.'" (citation omitted)); *id.* ("It is also unclear whether Thomas consented to answering questions from police officers. There are insufficient facts about Defendant Farr's involvement . . . ."). To that end, there was "no further [relevant] information" in the record beyond Defendant Farr's statement that he "tailed [Plaintiff] Thomas'[s] vehicle in an unmarked vehicle," Plaintiff Thomas's statement "that two men were present in the vehicle in the parking lot and asked her questions," and Defendant Murchie's admission that "he was in the vehicle and asked Thomas questions." *Id.* at *8.

Count II was dismissed against all Defendants less Defendant Murchie. *Id.* at *10; *see also id.* at *6 ("Plaintiffs Ford, LT 1, and LT 2 alleged that their Fourth Amendment right to be free from unreasonable seizures was violated when they were (1) detained, handcuffed, and interrogated outside their home and then (2) subject to additional detainment and interrogation by Defendant Murchie."); *id.* at *7 ("There is no reason to review the facts regarding the detention of the male Plaintiffs at the house because the police officers are entitled to qualified immunity for

their detention during the execution of the search warrant."). Factually, Count II was dismissed because "[b]oth parties admit that by the time Detective Trooper Murchie detained and interrogated Plaintiffs, the male Plaintiffs were at the police station and no longer at the house where the search warrant was being conducted. This information alone is sufficient to establish a potential violation of Plaintiffs' constitutional rights." *Id.* at *8 (internal citations omitted)).

And Count III was left fully intact. *Id.* at *10; *see also id.* at *9 ("Defendants have not identified sufficient facts to conclude that the search was reasonable and therefore that they did not violate Plaintiffs' rights."). To that end, "the only evidence available of the search [was] nine pictures from Plaintiffs showing significant damage to the property, multiple police reports describing the extensive damage, and one police officer who averred that most of the damage occurred in their efforts to encourage DMF to leave the house." *Id.* at 9 (internal citations omitted).

Defendants appealed, and the Sixth Circuit remanded the case for want of jurisdiction in November 2020, causing a nine-month delay in the case. *Thomas v. Bauman*, 835 F. App'x 5 (6th Cir. 2020) (unpublished). According to the Sixth Circuit, the Defendants' arguments for qualified immunity only raised questions of fact. *See id.* at 8 (holding that Defendants did not "raise[] the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law" (quoting *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007))). Indeed, Defendants "contradicted [Plaintiffs'] version of the facts at every turn." *Id.* (quoting *Berryman v. Rieger*, 150 F.3d 561, 564 (6th Cir. 1998)). As the Sixth Circuit elaborated, Defendants' entire argument was premised on the court "believe[ing] [their] version of the facts." *Id.* (same). Such "determinations of evidence sufficiency," according to the Sixth Circuit, could be made independent of Plaintiffs' claims. *Id.* (quoting *Behrens v. Pelletier*, 516 U.S. 299, 313

(1996)). And the case's grounding in qualified immunity, the Sixth circuit held, did not change the calculus. *Id.* (same).

### C.

Relying on new information learned during discovery, in March 2021, Plaintiffs filed a third amended complaint making three substantive changes: (1) adding Count IV for intentional infliction of emotional distress; (2) adding Defendant Inspector David Simon and naming him in Counts II, III, and IV; and (3) adding Defendants Arndt, Lambert, Lewis, Lubelan, McComb, Miller, Simon, and Sosinski to Count IV. ECF No. 44. Defendants answered in April 2021. ECF No. 50. On August 3, 2021, the parties stipulated to adjourn the dispositive-motion deadline for four months (i.e., to December 3, 2021). ECF No. 56. Meanwhile, the parties continued discovery.

Four months later, on the dispositive-motion deadline, Defendants filed a motion for leave to file a second motion for summary judgment, as required by Local Rule 7.1(b)(2). ECF No. 59. For lack of good cause, this Court denied Defendants' Motion for Leave. *Thomas v. Lambert*, No. 1:19-CV-11046, 2022 WL 433155 (E.D. Mich. Feb. 11, 2022); ECF No. 67. Fourteen days later, Defendants filed a motion for reconsideration, which will also be denied. ECF No. 68.

### II.

Local Rule 7.1(h) distinguishes the standard of review for motions for reconsideration of final orders, E.D. Mich. LR 7.1(h)(1), as opposed to nonfinal orders, E.D. Mich. LR 7.1(h)(2). Plaintiff's motion seeks review of a nonfinal order.

Local Rule 7.1(h)(2) provides that:

> Motions for reconsideration of non-final orders are disfavored. They must be filed within 14 days after entry of the order and may be brought only upon the following grounds:
> > (A) The court made a mistake, correcting the mistake changes the outcome of the prior decision, and the mistake was based on the record and law before the court at the time of its prior decision;

(B) An intervening change in controlling law warrants a different outcome; or

(C) New facts warrant a different outcome and the new facts could not have been discovered with reasonable diligence before the prior decision.

E.D. Mich. LR 7.1(h)(2).

Defendants have not presented any new facts or controlling law in their motion. Therefore, only Local Rule 7.1(h)(2)(A) applies to their Motion. Local Rule 7.1(h)(2)(A) requires the movant to demonstrate (1) that the court made a mistake, (2) that correcting the mistake changes the outcome of the prior decision, and (3) that the mistake was based on the record and law before the court at the time of its prior decision. *Hillman Power Co. v. On-Site Equip. Maint., Inc.*, No. 1:19-CV-11009, 2022 WL 193598, at *3 (E.D. Mich. Jan. 21, 2022) (citing E.D. Mich. LR 7.1(h)(2)(A)).

Accordingly, to warrant a change in outcome, Defendants must identify something in the record or law before this Court at the time of its prior Order that demonstrates a mistake. They have not.

**III.**

Defendants offer four arguments for reconsideration under Rule 7.1(h)(a)(A).

**A.**

First, Defendants argue that their Motion should be granted because "prior denials of qualified immunity were without prejudice and based upon the need for factual development." ECF No. 68 at PageID.874. Because they "completed that factual development," Defendants explain, they "had the expectation that qualified and governmental immunity would be decided on the merits for each of them and in light of Plaintiffs' own sworn testimony about what happened to them and who did what in what context." *Id.* at PageID.874–75. In effect, Defendants contend— as they did in their Motion for Leave—that this Court should decide whether they are entitled to

- 6 -

qualified immunity for a second time. As explained below, Defendants' first argument subsumes their second argument that this Court should vacate its prior Order because it "did not grapple with the bulk of the new factual development." ECF No. 68 at PageID.876.

This Court already addressed the analogue to those arguments in denying Defendants' request for leave. *See Thomas v. Lambert*, No. 1:19-CV-11046, 2022 WL 433155, at *4 (E.D. Mich. Feb. 11, 2022) ("Defendants have not cited any intervening decisions requiring this Court to address qualified immunity twice on substantially similar facts."). Indeed, this Court's Order twice indicated that it reviewed all the exhibits. *See id.* at *3 ("Moreover, after reviewing Defendants' purportedly new evidence, a motion for summary judgment from Defendants on the IIED claims would likely bear no fruit."); *id.* at *4 ("[T]he newly filed exhibits appear to bolster Plaintiffs' claims.").

Defendants effectively argue now that by denying their motion for summary judgment without prejudice, this Court was welcoming a new motion for summary judgment after Defendants gathered more facts through discovery. On the contrary, though a denial without prejudice does not foreclose a later motion of the same type, it also does not guarantee that such a motion will be permitted; the only motion invited by a denial without prejudice of a motion for summary judgment is *a motion for leave* to file a motion for summary judgment. *See* E.D. Mich. LR 7.1(b)(2) ("A party must obtain leave of court to file more than one motion for summary judgment."). Defendants were aware of the Local Rules when they elected to proceed to summary judgment without the benefit of discovery. Nothing requires this Court to wind back the clock.

This Court did not summarize those 13 exhibits because it did not believe it was necessary. To be sure, the exhibits Defendants submitted with their Motion for Leave—whether considered

independently or collectively—do not justify leave to file a second motion for summary judgment. *See* ECF No. 68 at PageID.876, 877–79 (citing Exs. A, B, D, E, F, G, H, I, J, K, L, M, N).

Defendants' Motion for Reconsideration merely requests reconsideration of the evidence that has been considered. A motion for reconsideration that merely reasserts the same facts and legal arguments previously asserted is not proper unless there was some defect in the first hearing that misled the court and the parties. *Pakideh v. Ahadi*, 99 F.Supp.2d 805, 809 (E.D. Mich.2000); *accord ComForCare Franchise Sys., LLC v. ComForCare Hillsboro McMinnville Corp.*, No. 2:19-CV-12037, 2019 WL 7584403, at *1 (E.D. Mich. Nov. 20, 2019); *Hudson v. City of Highland Park*, No. 2:16-CV-12369, 2017 WL 11535059, at *1 (E.D. Mich. Oct. 27, 2017); *Yahya v. Yemenia-Yemen Airways*, No. 2:08-CV-14789, 2009 WL 3873658, at *1 (E.D. Mich. Nov. 18, 2009); *Pitts v. Zych*, No. 2:09-CV-12329, 2009 WL 2488108, at *1 (E.D. Mich. Aug. 11, 2009); *Smith v. Cook*, No. 2:08-CV-10543, 2008 WL 1902022, at *1 (E.D. Mich. Apr. 28, 2008); *Smith v. Daughtrey*, No. 2:08-CV-10541, 2008 WL 1901321, at *1 (E.D. Mich. Apr. 25, 2008); *Dell v. Straub*, No. 2:00-CV-71853, 2002 WL 1303089, at *2 (E.D. Mich. June 6, 2002); *see United States v. Lewis*, 166 F. App'x 803, 806 (6th Cir. 2006) (holding that a district court's denial of a motion for reconsideration "is not subject to review" if it "merely restated the reasons" for its prior denial of the same arguments); *see also United States v. Hemingway*, 930 F. Supp. 2d 11, 12 (D.D.C. 2013). Thus, Defendants' Motion will be denied on these grounds.

This Court will nevertheless entertain Defendants' request by explaining why each exhibit does not, in this Court's view, warrant leave for a second motion for summary judgment.

## B.

The following 16 exhibits were considered in denying Defendants' Motion for Leave to File a Second Motion for Summary Judgment. *See* discussion *supra* III.A.

Exhibit A is an excerpt of a transcript from Plaintiff Thomas's deposition. ECF No. 59-1 at PageID.591–600. Plaintiff Thomas stated that she got off work, took her coworker home, went to her sister's house, then exited her vehicle after which four marked and unmarked police cars came from "both directions." *See id.* at PageID.593–96. She "threw [her] hands in the air" and an unidentified male officer detained her in the front seat of a police cruiser, where another male officer was in the back seat. *See id.* She added that the officers told her she was detained "upon pulling up," and that they drove her to a school parking lot across the street from her sister's house where she told the officers that her boys "played video games on a regular basis," then they had some other "small little chitchat." *See id.* at PageID.597. She said that the officers asked her where her son DF was, and that she told them that DF did not live with her. *See id.* She elaborated that she called DF's phone and told him to turn himself in. *See id.* Then she said that she cooperated with the police until they told her "they were going to knock out [her] windows and tear down [her] door," after which she offered her keys instead. *See id.* at PageID.598. She stated that the officers later threatened to destroy her home again while she was in the parking lot of the Buena Vista Police Station after they released her and her sons; even though she offered her keys again, the officers said something similar to "we have protocol to follow." *See id.* The excerpt concludes with Plaintiff Thomas unable to identify the officers by name. *See id.* at PageID.599. Plaintiff Thomas's deposition would not resolve any material issue of fact in Defendants' favor.

Exhibit B is an excerpt of a transcript from Defendant Murchie's deposition. ECF No. 59-1 at PageID.601–09. Defendant Murchie stated that Defendant Farr followed Plaintiff Thomas from work, and that he and others "contacted her on Hammel Street . . . . as she pulled in[to]" a "residence." *Id.* at PageID.604. Defendant Murchie asserted that Plaintiff Thomas told him "that she wasn't sure who was home at the house," that he did not recall whether he asked Plaintiff

Thomas if DF lived with her, that he could "see her being concerned" about her children, that he "asked her if she was willing to sit with [him]," that he meant no disrespect when he regrettably called one of the young Black kids "boy," and that he remembers Plaintiff Thomas "crying and want[ing] to leave and someone telling her that she couldn't leave because she's detained and threatened her with arrest if she tried to leave." *Id.* at PageID.605–08. Then Defendants' counsel begins to object to the form and foundation of the question "do you blame her?" *Id.* at PageID.608. The excerpt ends with Defendant Murchie interrupting his counsel to consolingly admit, "No. I remember that. I'm the one that told her, I said, 'Crystal, I don't want to have to arrest you. . . . I wish I wouldn't have said that. . . . I had nothing to arrest her for." *See id.* Defendant Murchie's deposition would not resolve any material issue of fact in Defendants' favor.

Exhibit C is the audio file detailed at length in the Order denying Defendant's motion for leave. ECF No. 59-1 at PageID.610. As explained in that Order, that audio does not resolve any material issue of fact in Defendants' favor.

Exhibit D is an excerpt of a transcript from Defendant Lambert's deposition. ECF No. 59-1 at PageID.611–18. Defendant Lambert recalls telling some of the officers to bring the male Plaintiffs inside because it was cold outside, that one of the boys was "overwhelmed," and that the officers would not have believed Plaintiffs if they told the officers that DF was not in the house based on the "totality of everything" and their "training and experience." *See id.* at PageID.613. Defendant Lambert also indicated that he could tell two of the males were around 12 years old, that one of the male Plaintiffs told him that "his brother was in [the house]," and that the boy would be lying if he said otherwise. *See id.* at PageID.613–15. Defendant Lambert also acknowledged that he and his colleagues handed the male Plaintiffs over to the officers who "transported [them] over to a Buena Vista Police Department vehicle," and that he talked to the other officers about

the incident after it occurred, which they "always" do to discuss "what went right, what went wrong." *See id.* at PageID.615–17. Defendant Lambert's excerpt ends with him saying that none of the other officers "criticized or disciplined [him] in any regard," and that "99.9 percent of the time . . . no one ever cared about [the] cost" of such incidents. *See id.* at PageID.617. As known now, DF was not in the house, so a reasonable juror could conclude that Defendant Lambert was either mistaken or shielding Defendants. Defendant Lambert's deposition would not resolve any material issue of fact in Defendants' favor.

Exhibit E is an excerpt of a transcript from Plaintiff LT1's deposition. ECF No. 59-1 at PageID.619–26. Plaintiff LT1 indicated that the officers megaphoned him and his brothers to come out the house, that the officers told him they questioned his brother, that the officers detained him and LT2 in a cell, that one of the officers took him into a hallway to remove his cuffs and threaten to "tear up [his] house" before taking him "back into the cell with [his] brother" where they waited for at least 30 more minutes. *See id.* at PageID.612–25. Plaintiff LT1 added that he could not confidently identify which officers did what solely based on their names. *See id.* at PageID.625. Plaintiff LT1's deposition would not resolve any material issue of fact in Defendants' favor.

Exhibit F is an excerpt of a transcript from Defendant Miller's deposition. ECF No. 59-1 at PageID.627–31. Defendant Miller merely stated that he heard one of the three brothers say, "My brother" while they were all standing together, adding that everything Defendants did to Plaintiffs was "slow and methodical." *See id.* at PageID.629–30. Defendant Miller's deposition would not resolve any material issue of fact in Defendants' favor.

Exhibit G is an excerpt of a transcript from Defendant Lubelan's deposition. ECF No. 59-1 at PageID.632–37. Defendant Lubelan stated his belief that "driv[ing] a Bearcat into a residence" is "not an extreme step," that they "use it more frequently now," and that he "believed [that he

saw] a black male" inside the house who was "taller than the third person that walked out." *See id.* at PageID.634–36. As known now, DF was not in the house, so a reasonable juror could conclude that Defendant Lubelan was either mistaken or shielding Defendants. Defendant Lubelan's deposition would not resolve any material issue of fact in Defendants' favor.

Exhibit H is an excerpt of a transcript from Plaintiff LT2's deposition. ECF No. 59-1 at PageID.638–45. Plaintiff LT2 stated that, though he was not zip-tied, both of his brothers were. *Id.* at PageID.642. He then explained that the officers asked him about his brother DF at the scene and later detained and questioned him in a room at the Buena Vista police station with the door closed and no windows for at least 15 minutes. *See id.* at PageID.643–44. Defendant Lewis's deposition would not resolve any material issue of fact in Defendants' favor.

Exhibit I is an excerpt of a transcript from Plaintiff Ford's deposition. ECF No. 59-1 at PageID.646–764. Plaintiff Ford gave some background on himself and his relationship with his brother DF. *See id.* at PageID.649–709. Then Plaintiff Ford detailed how he and his little brothers were inside their house playing videos games when they saw more than 50 police officers exit 20 marked and 15 unmarked cars parked around their house and in their yard armed with "military outfits," rifles, shotguns, and shields. *See id.* at PageID.709–17. Then he explained that the officers ordered him to exit the house, directed him to approach, told him to turn around, cuffed his hands, and "threw [him] in the back of the SWAT truck." *Id.* at PageID.717–21. He said that he did not know which officers arrested him. *Id.* at PageID.721. He explained how he told the officers that his brother DF was not in the house, that the officers threatened to charge him with murder and harboring a fugitive if the officers "kill" DF, that he told the officers that Plaintiffs LT1 and LT2 were still in the house, and that the officers megaphoned his little brothers to come out of the house, which they did. *Id.* at PageID.721–26. After Plaintiffs LT1 and LT2 exited the house, the

officers "put [them] in zip ties." *Id.* at PageID.726. Plaintiff Ford disclosed how neither he nor his little brothers had shirts on, that the officers made his brothers stand shirtless outside for questioning, that the officers put him in a high-pressure rear arm lock, that the officers were "nasty" to his grandmother when she arrived, and that the officers never showed a search warrant to anyone. *Id.* at PageID.726–33. Then he explained that after nearly an hour of questioning on the scene, the officers drove him and his two brothers—handcuffed—in a Buena Vista police cruiser to the Buena Vista police station, where the police "cross-examined [them] against each other like [they] weren't brothers." *Id.* at PageID.733–36. The officers put his "brothers into the holding cells," where the officers questioned them while they questioned Plaintiff Ford in an "office." *Id.* at PageID.736. Plaintiff Ford stated that the male Plaintiffs were detained at the station and questioned for about 20 minutes before "two more officers escort[ed] [his] mom into the police station," that he begged for a shirt because was he "cold" and "shaking" in the "central air," that the officers put his shirt on him because he was handcuffed, and that Plaintiff Thomas demanded "they be cut loose," after which they "ended up in a room." *Id.* at PageID.738–41. Eventually, he explained, the officers took all four of them back to their house in a police cruiser, that the officers stayed at their house until "7:30 in the morning the next day," and that he lost his job because of the raid. *See id.* at PageID.741–50. The rest of his deposition merely demonstrates that he could not identify which officers did what solely by name, and that—besides one wallet, phone, TV, washer, dryer, and refrigerator—his family could not recover any of their belongings because there was nothing left to salvage. *See id.* at PageID.750–64. The excerpt ended with Defendants' attorney repeatedly asking Plaintiff Ford "Well, how much do you want to settle your case?" *Id.* at PageID.762. Plaintiff Ford's deposition would not resolve any material issue of fact in Defendants' favor.

Exhibit J is an excerpt of a transcript from Defendant Sosinski's deposition. ECF No. 59-1 at PageID.765–75. Defendant Sosinski indicates that the officers "went in a little above normal on that one," that it "went a little longer," that the officers were not sure whether DF was in the house that day, that Plaintiffs swore that DF was not in the house, that the damage the officers caused was "necessary and reasonable" and "not just about finding the person," that "juveniles are more of a concern" warranting a Bearcat, that the damage "continued for 7 hours," that he approved the use of a chainsaw, that he "don't have any regrets," that he was removed from the Emergency Support (ES) Team, and yet the mission was "a success" because "no hypothetical people died." *Id.* Defendant Sosinski's deposition would not resolve any material issue of fact in Defendants' favor.

Exhibit K is an excerpt of a transcript from Defendant Lewis's deposition. ECF No. 59-1 at PageID.776–80. Defendant Lewis twice indicates that he believed he "did [his] job correctly that day," and that he "believe[d]" that "Trooper Lubelan and Trooper Lambert" were the defendants who said that "they saw the suspect inside the residence." *Id.* at PageID.779. As explained above, a reasonable juror could conclude that Defendants Lubelan and Lambert were either mistaken or shielding Defendants. Defendant Lewis's deposition would not resolve any material issue of fact in Defendants' favor.

Exhibit L is an excerpt of a transcript from Defendant Arndt's deposition. ECF No. 59-1 at PageID.781–87. Defendant Arndt stated that he believes the damage was "excessive" but "reasonable," and that he was never "trained by the ES Team." *Id.* at PageID.786. Defendant Arndt's deposition would not resolve any material issue of fact in Defendants' favor.

Exhibit M is an excerpt of a deposition of Defendant Simon. ECF No. 59-1 at PageID.788–94. This deposition will be given its due when this Court addresses Defendant Simon's Motion for

Summary Judgment, *see* ECF No. 69. Yet Defendant Simon's deposition says nothing about whether the other Defendants violated Plaintiffs' constitutional rights.

Exhibit N is an excerpt of a transcript of a deposition of Defendant McComb. ECF No. 59-1 at PageID.795–801. In the deposition, Defendant McComb refuses to answer whether he believes the force used was reasonable and suggests that none of the "force" would have occurred if the officers had thought DF was not in the house. *See id.* Defendant McComb's deposition would not resolve any material issue of fact in Defendants' favor.

Exhibit O is four selfies of two young Black men holding what appear to be handguns. ECF No. 59-1 at PageID.802–06. These photographs would have no effect on whether Defendants violated Plaintiffs' constitutional rights.

Exhibit P is the aerial footage detailed at length in the Order denying Defendants' motion for leave. ECF No. 59-1 at PageID.807. As explained, that footage does not resolve any material issue of fact in Defendants' favor.

## C.

Not only because Defendants merely reassert the same facts and legal arguments that this Court already considered and rejected, but also because Defendants' purportedly new exhibits do not warrant leave to file a second motion for summary judgment, Defendants are not entitled to reconsideration based on their first or second argument.

## IV.

Third, Defendants assert that this Court should vacate its prior Order because they "have received no merits determination on" "the intentional infliction of emotional distress (IIED) claim under Michigan law." ECF No. 68 at PageID.879. Defendants elaborate that "[t]here is no Michigan precedent that permits the recovery of damages for emotional injuries allegedly suffered

as a consequence of property damage." *Id.* (quoting *McGrew v. Duncan*, 333 F. Supp. 3d 730, 743 (E.D. Mich. 2018)).

But all the named defendants in Plaintiff's Count IV for IIED are named in Plaintiffs' Count II for false arrest. *Compare* ECF No. 44 at PageID. 481, *with id.* at PageID.486.

In Michigan, "false arrest is a form of false imprisonment." *Minor v. City of Sylvan Lake*, No. 314220, 2014 WL 6686682, at *5 (Mich. Ct. App. Nov. 25, 2014) (unpublished) (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). And Michigan allows defendants to bring IIED claims for false arrest and false imprisonment. *See Minor v. City of Sylvan Lake*, No. 314220, 2014 WL 6686682, at *13 (Mich. Ct. App. Nov. 25, 2014) (per curiam) (unpublished) (Murphy, C.J., concurring in part and dissenting in part) (citing *Walsh v. Taylor*, 689 N.W.2d 506, 517–18 (Mich. Ct. App. 2004)).

Defendants argue that the property damage they inflicted precludes Plaintiffs' IIED claims. But that argument disregards the fact that the false arrests occurred because Defendants believed the property needed to be destroyed to safely search for DF; the property destruction attendant to the search is Defendants' justification for detaining Plaintiffs outside their house. In this way, questions of fact remain regarding Plaintiffs' IIED claims due to Defendants' alleged involvement in the false arrests and the events leading up to them.

This Court has reviewed all Defendants' exhibits with an eye toward Plaintiffs' IIED claims, which it noted when it denied Defendants' request for leave in the prior Order. *See Thomas v. Lambert*, No. 1:19-CV-11046, 2022 WL 433155, at *3 (E.D. Mich. Feb. 11, 2022) ("Moreover, after reviewing Defendants' purportedly new evidence, a motion for summary judgment from Defendants on the IIED claims would likely bear no fruit."). And Defendants' repeated argument

that "governmental immunity must be decided in the first instance" does not change the analysis and was already addressed in the prior Order. *See* ECF No. 68 at PageID.880.

To be clear, Defendants' new evidence does not warrant leave for Defendants to file a second motion for summary judgment. *See* ECF No. 59-1 at PageID.590–807. Consequently, their third argument does not warrant reconsideration of this Court's prior Order.

## V.

Fourth, Defendants assert that this Court should vacate its prior Order because they "will suffer great prejudice." ECF No. 68 at PageID.880. Granting leave to file a dispositive motion on only the IIED claims, Defendants conclude, would "narrow the parties and claims that truly must go to trial," which "would also mean more manageable proofs, jury instructions, and verdict forms." *Id.* at PageID.881.

Obviously, denying a motion has a consequence for the losing party, as is the nature of the adversarial system. But the consequences for Defendants here do not justify granting leave to file a second motion for summary judgment. Notably, Defendants do not address the counterbalancing effect of prejudice that granting leave would have on Plaintiffs, which this Court considered when denying Defendants' request for leave. *See Thomas*, 2022 WL 433155, at *4 ("Further, this case was delayed for some time to address Defendants' appeal of the qualified-immunity issues, and Defendants' request to file a second motion for summary judgment will likely lead to further delay and unduly prejudice Plaintiffs."). Similarly, judicial efficiency does not warrant leave to file a second motion for summary judgment. *Cf. Com. Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, 233 F.R.D. 355, 362 (S.D.N.Y. 2005). Even if Defendants had addressed these points in their request for leave, Defendants would have been just as convincing as they are now.

- 17 -

To be clear, neither prejudice nor judicial efficiency demonstrate that Defendants are entitled to reconsideration.

Consequently, Defendants' Motion for Reconsideration will be denied.

**VI.**

Accordingly, it is **ORDERED** that Plaintiff's Motion for Reconsideration, ECF No. 68, is **DENIED**.

Dated: March 28, 2022                                    s/Thomas L. Ludington
                                                        THOMAS L. LUDINGTON
                                                        United States District Judge