UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CRYSTAL THOMAS, *et al.*,

        Plaintiffs,

v.

KELLY LAMBERT, *et al.*,

        Defendants.

_____/

Case No. 1:19-cv-11046

Honorable Thomas L. Ludington
United States District Judge

**OPINION AND ORDER DENYING DEFENDANT SIMON'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION TO ADJOURN DEADLINE TO CHALLENGE EXPERT WITNESSES**

Chief David Simon, a former inspector of the Michigan State Police's Special Operations Division, has filed a Motion for Summary Judgment arguing that (1) he is entitled to qualified immunity because he was not personally involved in the detention of Plaintiffs and the search of Plaintiffs' house; (2) he is not legally responsible for the conduct of the Emergency Services (ES) Team that he sanctioned; (3) Plaintiffs' claim for intentional infliction of emotional distress (IIED) fails because Michigan does not recognize IIED claims for property destruction; and (4) he is immune from Plaintiffs' IIED claim because he sanctioned the ES Team in good faith.

As explained hereafter, the Motion will be denied because (1) Defendant Simon was personally involved by approving the ES Team; (2) officials can be liable for the conduct of an ES Team that they approved if they have reason to know that the ES Team would act the way that it did; (3) Michigan IIED claims are properly grounded in the law of unlawful arrests; and (4) there are questions of fact about whether Defendant Simon acted in good faith and whether his approval of the ES Team was ministerial.

**I.**

**A.**

On November 28, 2018, Saginaw County and Michigan State Police Troopers responded to a reported armed robbery. Victims KY and JU explained that they had planned to purchase a firearm from DF at a barbershop in Saginaw, Michigan. ECF No. 21-2 at PageID.212–14. Instead of selling the firearm, 16-year-old DF allegedly used the firearm to steal approximately $150 from the two illegal-firearms buyers. *See id.* The dealers identified DF in a photo line-up, and Saginaw County District Judge Fichtner authorized a search warrant for DF at his last known address: the house of his mother, Plaintiff Crystal Thomas. *Id.* at PageID.212, 220; ECF No. 21 at PageID.184.

Based on the information provided by the officers who responded to the robbery, Defendant William Arndt completed a "Warrant Service Risk Assessment Matrix." ECF No. 21-5 at PageID.245. According to the Matrix, a score of 31 or higher warrants a Michigan State Police Emergency Services (ES) Team. *Id.* Applying the Matrix, Defendant Arndt scored DF at 95, more than triple the "high risk" score. *Id.*

Defendant Arndt sent the Matrix to Defendant David Simon, the current Chief of Police of Tittabawassee Township, whose duty was to approve or deny the deployment of the ES Team in executing warrants. ECF Nos. 21-5 at PageID.242; 69-1 at PageID.910–14; *see also* https://www.tittabawassee.org/department/public_safety/police_department/index.php [https://perma.cc/D7LC-Z9EU]. Chief David Simon was the inspector for the Michigan State Police's Special Operations Division in Lansing. *See* ECF No. 69-1 at PageID.910.

According to Chief Simon, he approved a "request for special services" for "the emergency support [ES] team to serve a hazardous warrant" to arrest 16-year-old DF. ECF No. 69-1 at PageID.911–12. He stated that he was trained on the ES Team's operations in 1996 and, though

"[t]actics and equipment and things like that change frequently," he did not receive any additional ES training despite being part of the Team. *See id.* at PageID.912. He also did not know the name of the "tank-like vehicle" that Defendants used to ram a hole in Plaintiffs' house: "the Bearcat." *Id.*

Chief Simon corroborates that his position as inspector required him to effectuate a department policy to "follow the matrix," which authorized deployments of the ES Team and the use of certain equipment. *Id.* at PageID.913. Chief Simon also stated that the ES Team typically does not use the Bearcat for cases that do not involve felonies "without some other exigent circumstances." *Id.* He elaborated that, though he "think[s] the form is good for recommendation and for use of the [ES] team," he did not "think" that he ever filled out a matrix. *Id.* at PageID.913–14. Chief Simon also stated that he has only refused at most ten ES Team requests in 30 years. *See* ECF No. 59-1 at PageID.792–93. And Chief Simon explained that his sole role in the underlying incident was authorizing the deployment of the ES Team. ECF No. 69-1 at PageID.914.

B.

On November 30, 2018, Defendant Officers from the Saginaw County and Michigan State Police went to Plaintiff Crystal Thomas's house to execute the warrant to arrest 16-year-old DF for stealing approximately $150 from two illegal-firearms dealers. *See Thomas v. Farr*, No. 19-11046, 2020 WL 674342, at *1–5 (E.D. Mich. Feb. 11, 2020). The police followed Thomas from work in an unmarked vehicle, pulled her over, secured her, and took her to an abandoned school where they questioned her about DF. *Id.* She offered Defendants a key to her house to check for DF, but they replied that "they had certain protocol they have to follow, which would entail smashing out the windows of [her] home and breaking down the doors." *Id.* (quoting ECF No. 24-3 at PageID.376).

In executing the arrest warrant for DF, Defendants destroyed about $16,000 worth of Plaintiffs' property. *See id.* After those efforts, Defendants transported Plaintiff Thomas's three children, and later Plaintiff Thomas, to the Buena Vista police station for questioning about DF, who did not live with Plaintiffs and was not present during the execution of the warrant. *Id.*

### C.

In April 2019, Plaintiffs filed a complaint alleging that Defendants unlawfully detained Plaintiff Thomas in a police cruiser in the parking lot of an abandoned school before the raid; that Defendants unlawfully detained Plaintiffs LT1, LT2, and Matthew Ford (Thomas's three sons) at their house during the raid and at the Buena Vista police station after the raid; and that Defendants unreasonably searched their house by, among other things, deploying robots and at least 28 gas bombs through the windows, slashing their floorboards with a chainsaw, and ramming the walls down with a 17,500 lb. armored vehicle named the Bearcat. *Id.* at *1; ECF Nos. 1; 44. The original complaint identified Aaron Bauman and John Doe Michigan State Police Officers 1–20 as Defendants. *Farr*, 2020 WL 674342, at *1. Defendant Aaron Bauman filed a motion to dismiss on June 14, 2019. *Id.*

Plaintiffs filed an amended complaint on July 5, 2019. *Id.* The amended complaint did not identify Defendant Bauman, so he was dismissed on July 9, 2019. *Id.* (citing ECF No. 9). In Count I, Plaintiff Thomas alleged that Defendants Farr and Wickersham unlawfully detained her in violation of the Fourth Amendment. In Count II, Plaintiffs Ford, LT1, and LT2 alleged that they were unlawfully detained by Defendants Arndt, Hoffman, Lambert, Lewis, Lubelan, McComb, Miller, Murchie, Pinkerton, Sosinki, Taylor, and Ziecina. In Count III, all Plaintiffs alleged that their Fourth Amendment right to be free from unreasonable searches was violated by Defendants

identified in Count II less Defendant Murchie. *Thomas v. Farr*, No. 19-11046, 2020 WL 674342, at *1 (E.D. Mich. Feb. 11, 2020).

**D.**

On October 25, 2019, ten days before the parties submitted their Rule 23(f) discovery plan, Defendants filed a motion for summary judgment seeking qualified immunity on all three counts. ECF No. 21. Twenty-five days later, the first Scheduling Order was entered with a May 5, 2020 discovery deadline. ECF No. 25. Less than three months later, Defendants' motion for summary judgment was denied and granted in part. *See generally Farr*, 2020 WL 674342.

Count I was dismissed without prejudice against Defendant Wickersham but not Defendant Farr. *Farr*, 2020 WL 674342, at *9–10; *see also id.* at *8 ("Plaintiff 'concur[ed] in dismissal without prejudice for Defendant Wickersham only.'" (citation omitted)); *id.* ("It is also unclear whether Thomas consented to answering questions from police officers. There are insufficient facts about Defendant Farr's involvement . . . ."). To that end, there was "no further [relevant] information" in the record beyond Defendant Farr's statement that he "tailed [Plaintiff] Thomas'[s] vehicle in an unmarked vehicle," Plaintiff Thomas's statement "that two men were present in the vehicle in the parking lot and asked her questions," and Defendant Murchie's admission that "he was in the vehicle and asked Thomas questions." *Id.* at *8.

Count II was dismissed against all Defendants less Defendant Murchie. *Id.* at *10; *see also id.* at *6 ("Plaintiffs Ford, LT 1, and LT 2 alleged that their Fourth Amendment right to be free from unreasonable seizures was violated when they were (1) detained, handcuffed, and interrogated outside their home and then (2) subject to additional detainment and interrogation by Defendant Murchie."); *id.* at *7 ("There is no reason to review the facts regarding the detention of the male Plaintiffs at the house because the police officers are entitled to qualified immunity for

their detention during the execution of the search warrant."). Factually, Count II was dismissed because "[b]oth parties admit that by the time Detective Trooper Murchie detained and interrogated Plaintiffs, the male Plaintiffs were at the police station and no longer at the house where the search warrant was being conducted. This information alone is sufficient to establish a potential violation of Plaintiffs' constitutional rights." *Id.* at *8 (internal citations omitted)).

And Count III was left fully intact. *Id.* at *10; *see also id.* at *9 ("Defendants have not identified sufficient facts to conclude that the search was reasonable and therefore that they did not violate Plaintiffs' rights."). To that end, "the only evidence available of the search [was] nine pictures from Plaintiffs showing significant damage to the property, multiple police reports describing the extensive damage, and one police officer who averred that most of the damage occurred in their efforts to encourage DMF to leave the house." *Id.* at 9 (internal citations omitted).

Defendants appealed, and the Sixth Circuit remanded the case for want of jurisdiction in November 2020, causing a nine-month delay in the case. *Thomas v. Bauman*, 835 F. App'x 5 (6th Cir. 2020) (unpublished). According to the Sixth Circuit, the Defendants' arguments for qualified immunity only raised questions of fact. *See id.* at 8 (holding that Defendants did not "raise[] the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law" (quoting *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007))). Indeed, Defendants "contradicted [Plaintiffs'] version of the facts at every turn." *Id.* (quoting *Berryman v. Rieger*, 150 F.3d 561, 564 (6th Cir. 1998)). As the Sixth Circuit elaborated, Defendants' entire argument was premised on the court "believe[ing] [their] version of the facts." *Id.* (same). Such "determinations of evidence sufficiency," according to the Sixth Circuit, could be made independent of Plaintiffs' claims. *Id.* (quoting *Behrens v. Pelletier*, 516 U.S. 299, 313

(1996)). And the case's grounding in qualified immunity, the Sixth circuit held, did not change the calculus. *Id.* (same).

### E.

Relying on new information learned during discovery, in March 2021, Plaintiffs filed a third amended complaint making three substantive changes: (1) adding Count IV for intentional infliction of emotional distress; (2) adding Defendant Simon and naming him in Counts II, III, and IV; and (3) adding Defendants Arndt, Lambert, Lewis, Lubelan, McComb, Miller, Simon, and Sosinki to Count IV. ECF No. 44. Defendants answered in April 2021. ECF No. 50. On August 3, 2021, the parties stipulated to adjourn the dispositive-motion deadline for four months (i.e., to December 3, 2021). ECF No. 56. Meanwhile, the parties continued discovery.

Four months later, on the dispositive-motion deadline, Defendants filed a motion for leave to file a second motion for summary judgment, as required by Local Rule 7.1(b)(2). ECF No. 59. For lack of good cause, this Court denied Defendants' Motion for Leave and permitted Defendant Simon to file a motion for summary judgment as the claims related to only him. *Thomas v. Lambert*, No. 1:19-CV-11046, 2022 WL 433155 (E.D. Mich. Feb. 11, 2022); ECF No. 67. Fourteen days later, Defendants filed a motion for reconsideration, which was also denied. *Thomas v. Lambert*, No. 1:19-CV-11046, 2022 WL 909344 (E.D. Mich. Mar. 28, 2022); ECF Nos. 68; 72.

### F.

As permitted, Defendant Simon filed a motion for summary judgment, which will be denied in Part II. ECF No. 69. Also, Defendants collectively filed a motion to extend the deadline to file motions challenging experts, which will be granted in Part III. ECF No. 75.

II.

Defendant has filed a motion for summary judgment on Count II (unlawful arrest of Plaintiffs Ford, LT1, and LT2), Count III (unreasonable search and seizure of Plaintiffs' house), and Count IV (intentional infliction of emotional distress) of the Third Amended Complaint. ECF No. 69.

A.

A motion for summary judgment should be granted if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant has the initial burden of "identifying those portions of [the record that] it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The nonmovant must show more than "some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the "mere existence of a scintilla of evidence" in support of the nonmovant does not establish a genuine issue of material fact. *Liberty Lobby*, 477 U.S. at 252.

The court must review the evidence and draw all reasonable inferences in favor of the nonmovant to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52; *see Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018).

Summary judgment will be granted if the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. But summary judgment will be

denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted).

Although there are more elements to Plaintiffs' claims than discussed below, Defendant Simon's arguments are narrower and do not address all the elements of Plaintiffs' claims. Accordingly, this Court will address Plaintiffs' claims only to the extent that Defendant Simon has contested them. *Celotex Corp.*, 477 U.S. at 323 (holding that the movant has the initial burden of "identifying those portions of [the record that] it believes demonstrate the absence of a genuine issue of material fact.").

**B.**

Defendant Simon first argues that he is entitled to qualified immunity on all three counts. *See* ECF No. 69 at PageID.898–900. As explained below, based on the record presently before this Court, Defendant is not entitled to qualified immunity as a matter of law.

**1.**

Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The qualified-immunity doctrine protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified

immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Whether Defendant Simon should receive qualified immunity depends on whether his actions violated clearly established law. *Id.* at 243–44. "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Id.* at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). "To be clearly established, a right must be sufficiently clear 'that every reasonable official would [have understood] that what he is doing violates that right.'" *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

When a defendant raises qualified immunity as a defense, "the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006). The relevant inquiry is whether "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001); *see also* Amy L. Moore, *The Due Process Conundrum: Using* Mathews v. Eldridge *As A Standard for Private Hospitals Under the Health Care Quality Improvement Act*, 2 BELMONT L. REV. 1, 17–19 & n.109 (2015) (noting that qualified immunity is a "quintessential" legal question).

**2.**

This Court has already determined that Plaintiffs have a clearly established Fourth Amendment right to be free from unreasonable searches and seizures. *See Thomas v. Farr*, No. 19-11046, 2020 WL 674342, at *6–7, 8, 9 (E.D. Mich. Feb. 11, 2020). Defendant Simon does not contest Plaintiff's clearly established right.

Defendant Simon argues that he is entitled to qualified immunity for Counts II and III because he was not present when the warrant was executed. *See* ECF No. 69 at PageID.899–900 ("[T]he Sixth Circuit requires personal involvement to impose 1983 liability on law enforcement officers." *Id.* at PageID.900 (citing *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010))).

Defendant Simon's argument is inapt. The holding of *Binay* does not apply to this case because *Binay* addressed a claim alleging the use of excessive force—not a claim alleging unlawful detention or unreasonable search.

Even if *Binay*'s personal-involvement standard applies here, Defendant Simon was "personally involved" in Plaintiffs' detention and the search of Plaintiffs' house. In *Binay*, the Sixth Circuit rejected one defendant's argument that he had no personal involvement in the detention because the defendant "sanctioned the continued use of force." *Binay*, 601 F.3d at 651. As Chief Simon has acknowledged, he personally and solely authorized the deployment of the ES Team to execute an arrest warrant at Plaintiffs' house. ECF No. 69-1 at PageID.913–14; *see also* ECF No. 21-5 at PageID.240. If Defendant Simon had not authorized the ES Team, it would not have deployed to Plaintiffs' house, detained Plaintiffs, or destroyed their house. There is, therefore, at least a question of fact as to whether Defendant Simon was "personally involved in the conduct that violated the Fourth Amendment." *Binay v. Bettendorf*, 601 F.3d 640, 651 (6th Cir. 2010). Indeed, *Binay* specifically rejected the theory that the defendant officer must have "control over the [specific] decision" in question: here, the detention of Plaintiffs and the search of their house. *Id.*; *see also Fazica v. Jordan*, 926 F.3d 283, 289 (6th Cir. 2019) ("Having personal involvement in or direct responsibility for the violation of Plaintiff's constitutional rights does not, however, necessarily mean that each Defendant officer directly placed hands on her."); *James v. Anderson*, No. 12-10273, 2018 WL 6171474, at *21–22 (E.D. Mich. Nov. 26, 2018) (assuming that officers

are not qualifiedly immune for constitutional violations occurring "at the[ir] direction, or with the[ir] approval"). As indicated, there is a question of fact as to whether Chief Simon was "personally involved" in the ES Teams' conduct because he authorized the ES Team to engage in the conduct.[1]

Based on the record currently before this Court, Defendant Simon is not entitled to qualified immunity for the unlawful detention of Plaintiff Thomas, the search of Plaintiffs' home, or the unlawful detention of Plaintiffs Ford, LT1, and LT2 at the Buena Vista Police Department.

### C.

Defendant Simon next argues that Plaintiffs cannot establish supervisory liability for the constitutional torts. ECF No. 69 at PageID.901–03. Defendant explains that mere deployment of the ES Team "will not sustain a § 1983 claim." *Id.* at PageID.902 (citing *Ramage v. Louisville Cnty.*, 520 F. App'x 341 (6th Cir. 2013) (unpublished)).

Section 1983 liability must be based on more than the vicarious responsibility for the actions of others. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). But an official who authorizes the deployment of a SWAT or ES Team may still be liable under § 1983 if they "had [a] reason to think" that the team would engage in unconstitutional conduct. *Ramage v. Louisville Cnty.*, 520 F. App'x 341, 348 (6th Cir. 2013) (unpublished). Put another way, approving officials may be liable under § 1983 if they "either encouraged the specific incident of misconduct or in some other way directly participated in it." *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982); *see also Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016) (holding that if "an

---

[1] At least one judge in this district has found that a law-enforcement officials deemed "personally involved" for authorizing the conduct could still receive qualified immunity if they are the only party possibly liable for the underlying conduct. *See Terry v. City of Detroit*, No. 2:17-CV-11450, 2018 WL 2239559, at *2–3 (E.D. Mich. May 16, 2018). But Defendant Simon is not the only Defendant still involved at this juncture.

official's execution of his or her job function causes injury to the plaintiff, the official may be liable under the supervisory-liability theory" (citations omitted)).

Unlike the defendant in the noncontrolling case that Defendant Simon cited, Defendant Simon "had [a] reason to think that" Defendants would search Plaintiffs' house in the way that they did, and that Defendants would detain Plaintiffs. *Ramage*, 520 F. App'x at 348. That is, his approval of the ES Team arguably caused injury to Plaintiffs. *Peatross*, 818 F.3d at 242.

Indeed, several Defendants explicitly stated that the searches and seizures in this case were considered in line with department policy, custom, and protocol. ECF No. 59-1 at PageID.615–17 (stating that the officers "always" discuss "what went right, what went wrong" after incidents like this); *id.* at PageID.617 (stating that "99.9 percent of the time . . . no one ever cared about [the] cost" of such incidents"); *id.* at PageID.634–36 (testifying that "driv[ing] a Bearcat into a residence" is "not an extreme step," and that Defendants "use it more frequently now"); *id.* at PageID.765–75 (testifying that "juveniles are more of a concern" warranting a Bearcat); Audio tape: Conversation Between Crystal Thomas and Defendants, held by Michigan State Police, at 54:34–55:36 (Nov. 30, 2018) (on file with this Court), *in* ECF No. 64 (replying that Defendants knock down walls while kids are inside a house instead of knocking on the door because "they're not gonna go inside and risk anyone's life" due to their policy of "property over life"); *id.* at 56:10–56:16 (warning Plaintiff Thomas that "[i]f [Defendants] wanted to break [her] stuff, [they] wouldn't have tried to call [DF] out, [they] would have just went in there and braked [sic] it"); *id.* at 58:00–59:09 (assuring Plaintiff Thomas "that this is done in any situation"); *see also* ECF No. 59-1 at PageID.598 (stating that Defendant Meder said that knocking out windows and breaking down doors is "protocol to follow") (statement of Plaintiff Thomas).

Thus, a reasonable inference to draw is that, as the official authorizing the ES Team deployments, Chief Simon was aware of the Team's policies and customs to detain residents of houses before and after the search and to deploy the Bearcat for targets deemed "high risk" under the Michigan State Police Risk Assessment Matrix. In other words, there is a question of fact regarding whether Chief Simon participated in Defendants' conduct, because he knew that Plaintiffs were likely to be detained while the Bearcat destroyed Plaintiffs' house.

### D.

Defendant Simon's third argument is that Plaintiffs' claim of intentional infliction of emotional distress (IIED) fails as a matter of law. *See* ECF No. 69 at PageID.903–04.

To state a claim for IIED under Michigan law, Plaintiffs must show evidence of (1) Defendant Simon's extreme and outrageous conduct, (2) his intent or recklessness, (3) causation, and (4) Plaintiffs' severe emotional distress. *Lucas v. Awaad*, 830 N.W.2d 141, 150 (Mich. Ct. App. 2013) (citation omitted). Defendant Simon would be liable for IIED only if his conduct were "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Doe v. Mills*, 91, 536 N.W.2d 824 (Mich. Ct. App. 1995). Accordingly, "[l]iability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Id.*

Notably, Defendant relies on "the barricaded gunman situation" to justify the property damage. But there was no barricaded gunman. And Defendants have proffered inconsistent testimony about whether they even saw DF in the house before Defendants destroyed it. Moreover, Defendants continued to destroy Plaintiffs' house after a K-9 unit determined that it was empty. *See* ECF No. 21-2 at PageID.222.

Defendant adds that "[n]one of it was gratuitous or punitive." ECF No. 69 at PageID.904. But that is a question of fact, as the audio conversation between Plaintiff Thomas and Defendant Murchie shows disagreement about whether Defendants' actions were punitive. *Thomas v. Lambert*, No. 1:19-CV-11046, 2022 WL 433155, at *3 (E.D. Mich. Feb. 11, 2022). Moreover, Defendants have indicated that everything that they did to Plaintiffs was "slow and methodical." *See* ECF No. 59-1 at PageID.629–30; *see also id.* at PageID.765–75 (acknowledging that Defendants "went in a little above normal on that one," that it "went a little longer," that the officers were not sure whether DF was in the house that day, that Plaintiffs swore that DF was not in the house, and that the damage the officers caused was "necessary and reasonable" and "not just about finding the person").

Defendant Simon's final point on the IIED claim is that Michigan does not permit recovery for IIED claims for property damage. ECF No. 69 at PageID.904. But "that argument disregards the fact that the false arrests occurred because Defendants believed the property needed to be destroyed to safely [conduct the] search for DF; the property destruction attendant to the search is Defendants' justification for detaining Plaintiffs outside their house." *Thomas v. Lambert*, No. 1:19-CV-11046, 2022 WL 909344, at *8 (E.D. Mich. Mar. 28, 2022). Plaintiffs' IIED claims are not based on the damage to Plaintiffs' property; the IIED claims are based on Defendants falsely arresting and imprisoning Plaintiffs, which is a viable basis for an IIED claim in Michigan. *See Minor v. City of Sylvan Lake*, No. 314220, 2014 WL 6686682, at *13 (Mich. Ct. App. Nov. 25, 2014) (per curiam) (unpublished) (Murphy, C.J., concurring in part and dissenting in part) (citing *Walsh v. Taylor*, 689 N.W.2d 506, 517–18 (Mich. Ct. App. 2004)). And there is a question of fact as to whether Defendant Simon was "personally involved" in those arrests.

For those reasons, Plaintiff's IIED claim will not be dismissed against Defendant Simon.

**E.**

Defendant Simon's final argument is that he is entitled to governmental immunity under Michigan law for Plaintiffs' IIED claim. *See* ECF No. 69 at PageID.904–06. To be clear, this is a separate issue from qualified immunity under federal law.

Defendant Simon would be immune from intentional-tort liability only if he could prove that (1) his challenged acts were undertaken during the course of employment and that he was acting, or reasonably believed that he was acting, within the scope of his authority, (2) his acts were undertaken in good faith, and (3) his acts were discretionary, rather than ministerial, in nature. *Odom v. Wayne Cnty.*, 760 N.W.2d 217, 218 (2008).

**1.**

Good faith "is subjective in nature." *Odom*, 760 N.W.2d at 229. The good-faith element "protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent." *Id.* That malicious intent is defined as "conduct or a failure to act that was intended to harm the plaintiff . . . [or] that shows such indifference to whether harm will result as to be equal to a willingness that harm will result." *Id.* at 225.

There is a question of fact as to whether Defendant Simon's authorization of the ES Team was malicious or capricious. The telling sign is the Matrix itself. *See* ECF No. 21-4 at PageID.237. The Warrant Service Risk Assessment Matrix is an official form of the Michigan State Police, numbered OD-002. *Id.* Some of the factors on the Matrix overlap. For example, DF received duplicative points for an alleged "[h]istory of violent crimes against person(s)" and "police" and a "[h]istory of crime against persons." *Id.* Curiously, Defendant has offered no evidence of DF's history of violent crimes against police. Another example is that DF received duplicative points

for being "[k]nown to carry a firearm on person" and having "[f]irearms present at location." *Id.* Defendant has also not proffered any evidence that firearms were present at Plaintiffs' house, and as now known, there were not any. In other words, there is a question of fact as to whether Defendant Simon's conduct was made in good faith or whether his conduct demonstrates a careless disregard for the collateral damage of his approvals because (1) he testified that he does not "think" that he has ever filled out such a Matrix yet is the sole person in charge of approving them, ECF No. 69-1 at PageID.913–14; (2) the Matrix's calculations are dubious; and (3) he was not trained on the ES Team since 1996, ECF No. 69-1 at PageID.912.

**2.**

"Discretionary acts 'require personal deliberation, decision[,] and judgment.'" *Id.* at 226 (quoting *Ross v. Consumers Power Co.*, 363 N.W.2d 641, 668 (Mich. 1984) (per curiam)). By contrast, "[m]inisterial acts 'constitute merely an obedience to orders or the performance of a duty in which the individual has little or no choice.'" *Id.* at 226 (quoting *Ross*, 363 N.W.2d at 668). "The execution of an act once a decision has been made is also ministerial in nature." *Id.*

There is a question of fact as to whether Defendant Simon's approval of the Risk Assessment Matrix was a "discretionary" or "ministerial" act. Chief Simon acknowledged that his position as inspector required him to effectuate a department policy to "follow the matrix," which authorized deployments of the ES Team and the use of certain equipment. ECF No. 69-1 at PageID.913. He elaborated that, though he "think[s] the form is good for recommendation and for use of the [ES] team," he did not "think" that he ever filled out a matrix. *Id.* at PageID.913–14. Chief Simon also stated that he has refused at most ten ES Team requests in 30 years. *See* ECF No. 59-1 at PageID.792–93. But he did not state whether those denials were made under his discretion or because they did not score over 31, the score at which the Matrix recommends that

the "ES Team plans and executes [the] warrant." ECF No. 21-14 at PageID.237. Thus, a reasonable inference to draw from Chief Simon's testimony is that his duty as inspector, with respect to the Risk Assessment Matrix, was merely ministerial in that if a suspect has a "high risk" score, then he would always sanction the deployment of the ES Team as well as its customs, practices, and policies.

Because there is a question of fact on two elements of Plaintiff's IIED claim with respect to Defendant Simon, his Motion for Summary Judgment, ECF No. 69, will be denied.

### III.

Defendants have collectively filed a motion to adjourn the deadline to file motions challenging expert witnesses. ECF No. 75. Notably, Plaintiffs have not contested Defendants' request.

Federal courts have the inherent power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016). "A schedule may be modified only for good cause and with the judge's consent." FED. R. CIV. P. 16(b)(4.) Good cause is present if a party seeking to extend a deadline shows that despite its diligence it could not meet it. *Leary v. Daeschner*, 349 F.3d 888, 906 (6th Cir. 2003). "Another important consideration for a district court deciding whether Rule 16's 'good cause' standard is met is whether the opposing party will suffer prejudice by virtue of the amendment." *Id.* (citation omitted).

Good cause exists to grant Defendants' request. Defendants did not receive copies of two expert reports until Plaintiffs filed a response to Defendant Simon's motion for summary judgment. ECF No. 75 at PageID.1381. The third report did not arrive until after Defendants' counsel made further inquiry. *Id.* Plaintiffs' original attempt on October 11, 2021, to transmit the

reports was one month late under the scheduling order. *Id.* Plaintiffs sent the reports to "an incorrect e-mail address for Defendants' lead counsel with no copy to any of his co-counsel or support staff." *Id.* at PageID.1381–82. Without the expert reports, Defendants could not meet the November 11, 2021 deadline for motions challenging experts. *Id.* at PageID.1382.

The requested extension will not prejudice Plaintiffs. Plaintiffs have agreed to a May 13, 2022 deadline. *Id.* They will be in the same position as they would have been if their expert report disclosure was timely, with an opportunity to respond to any motion challenging experts. Denying the extension would prejudice Defendants by foreclosing the opportunity to review and challenge Plaintiffs' expert reports. And the May 13 deadline would not adversely impact any of the other existing dates in the current scheduling order.

For those reasons, Defendant's Motion to Adjourn, ECF No. 75, will be granted.

**IV.**

Accordingly, it is **ORDERED** that Defendant Simon's Motion for Summary Judgment, ECF No. 69, is **DENIED**.

Further, it is **ORDERED** that Defendant's Motion to Adjourn, ECF No. 75, is **GRANTED**.

Dated: April 28, 2022          s/Thomas L. Ludington
                    THOMAS L. LUDINGTON
                    United States District Judge