UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CRYSTAL THOMAS, *et al.*,

        Plaintiffs,                       Case No. 1:19-cv-11046

v.                                        Honorable Thomas L. Ludington
                                             United States District Judge

KELLY LAMBERT, *et al.*,

        Defendants.
_____/

**OPINION AND ORDER DENYING DEFENDANTS' *DAUBERT* MOTION**

Defendants filed a motion to exclude the expert testimony of Marty Bugbee and Andrew Scott. ECF No. 77. As explained hereafter, Defendants' Motion will be denied.

**I.**

**A.**

On November 30, 2018, Defendant Officers from the Saginaw County and Michigan State Police went to Plaintiff Crystal Thomas's house to execute an arrest warrant for her 16-year-old son, DF, who stole approximately $150 from two illegal-firearms buyers. *See Thomas v. Farr*, No. 19-11046, 2020 WL 674342, at *1–5 (E.D. Mich. Feb. 11, 2020).

The buyers identified DF in a photo line-up, and Saginaw County District Judge Fichtner authorized a search warrant for DF at his last known address: the house of his mother, Plaintiff Crystal Thomas. *Id.* at PageID.212, 220; ECF No. 21 at PageID.184.

The police followed Plaintiff Thomas from work in an unmarked vehicle, pulled her over, secured her, and took her to an abandoned school where they questioned her about DF. *Id.* She offered Defendants a key to her house to check for DF, but they replied that "they had certain

protocol they have to follow, which would entail smashing out the windows of [her] home and breaking down the doors." *Id.* (quoting ECF No. 24-3 at PageID.376).

In executing the arrest warrant for DF, Defendants destroyed about $16,000 worth of Plaintiffs' property. *See id.* After those efforts, Defendants transported Plaintiff Thomas's three other children, and later Plaintiff Thomas, to the Buena Vista police station for questioning about DF, who did not live with Plaintiffs and was not present during the execution of the warrant. *Id.*

**B.**

In April 2019, Plaintiffs filed a complaint alleging that Defendants unlawfully detained Plaintiff Thomas in a police cruiser in the parking lot of an abandoned school before the execution of the warrant; that Defendants unlawfully detained Plaintiffs LT1, LT2, and Matthew Ford (Thomas's three sons) at their house during the execution of the warrant and at the Buena Vista police station after the execution of the warrant; and that Defendants unreasonably searched their house by, among other things, deploying robots and at least 28 gas bombs through the windows, slashing their floorboards with a chainsaw, and ramming the walls down with a 17,500 lb. armored vehicle named the Bearcat. *Id.* at *1; ECF Nos. 1; 44. The original complaint named Aaron Bauman and John Doe Michigan State Police Officers 1–20 as Defendants. *Farr*, 2020 WL 674342, at *1. Defendant Aaron Bauman filed a motion to dismiss on June 14, 2019. *Id.*

Plaintiffs filed an amended complaint on July 5, 2019. *Id.* The amended complaint did not identify Defendant Bauman, so he was dismissed on July 9, 2019. *Id.* (citing ECF No. 9). In Count I, Plaintiff Thomas alleged that Defendants Farr and Wickersham unlawfully detained her in violation of the Fourth Amendment. In Count II, Plaintiffs Ford, LT1, and LT2 alleged that they were unlawfully detained by Defendants Arndt, Hoffman, Lambert, Lewis, Lubelan, McComb, Miller, Murchie, Pinkerton, Sosinki, Taylor, and Ziecina. In Count III, all Plaintiffs alleged that

their Fourth Amendment right to be free from unreasonable searches was violated by Defendants identified in Count II less Defendant Murchie. *Thomas v. Farr*, No. 19-11046, 2020 WL 674342, at *1 (E.D. Mich. Feb. 11, 2020), *appeal dismissed sub nom. Thomas v. Bauman*, 835 F. App'x 5 (6th Cir. 2020).

### C.

On October 25, 2019, ten days before the parties submitted their Rule 23(f) discovery plan, Defendants filed a motion for summary judgment seeking qualified immunity on all three counts. ECF No. 21. Twenty-five days later, the first Scheduling Order was set with a May 5, 2020 discovery deadline. ECF No. 25. Less than three months later, Defendants' motion for summary judgment was denied and granted in part. *See generally Farr*, 2020 WL 674342.

Count I was dismissed without prejudice against Defendant Wickersham, retaining Defendant Farr. *Farr*, 2020 WL 674342, at *9–10; *see also id.* at *8 ("Plaintiff 'concur[ed] in dismissal without prejudice for Defendant Wickersham only.'" (citation omitted)); *id.* ("It is also unclear whether Thomas consented to answering questions from police officers. There are insufficient facts about Defendant Farr's involvement . . . ."). To that end, there was "no further [relevant] information" in the record beyond Defendant Farr's statement that he "tailed [Plaintiff] Thomas'[s] vehicle in an unmarked vehicle," Plaintiff Thomas's statement "that two men were present in the vehicle in the parking lot and asked her questions," and Defendant Murchie's admission that "he was in the vehicle and asked Thomas questions." *Id.* at *8.

Count II was dismissed against all Defendants less Defendant Murchie. *Id.* at *10; *see also id.* at *6 ("Plaintiffs Ford, LT 1, and LT 2 alleged that their Fourth Amendment right to be free from unreasonable seizures was violated when they were (1) detained, handcuffed, and interrogated outside their home and then (2) subject to additional detainment and interrogation by

Defendant Murchie."); *id.* at *7 ("There is no reason to review the facts regarding the detention of the male Plaintiffs at the house because the police officers are entitled to qualified immunity for their detention during the execution of the search warrant."). Factually, Count II was dismissed because "[b]oth parties admit that by the time Detective Trooper Murchie detained and interrogated Plaintiffs, the male Plaintiffs were at the police station and no longer at the house where the search warrant was being conducted. This information alone is sufficient to establish a potential violation of Plaintiffs' constitutional rights." *Id.* at *8 (internal citations omitted)).

And Count III was left fully intact. *Id.* at *10; *see also id.* at *9 ("Defendants have not identified sufficient facts to conclude that the search was reasonable and therefore that they did not violate Plaintiffs' rights."). To that end, "the only evidence available of the search [was] nine pictures from Plaintiffs showing significant damage to the property, multiple police reports describing the extensive damage, and one police officer who averred that most of the damage occurred in their efforts to encourage DMF to leave the house." *Id.* at 9 (internal citations omitted).

Defendants appealed, and the Sixth Circuit remanded the case for want of jurisdiction in November 2020, causing a nine-month delay in the case. *Thomas v. Bauman*, 835 F. App'x 5 (6th Cir. 2020) (unpublished). According to the Sixth Circuit, the Defendants' arguments for qualified immunity only raised questions of fact. *See id.* at 8 (holding that Defendants did not "raise[] the purely legal question of whether the facts alleged . . . support a claim of violation of clearly established law" (quoting *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007))). Indeed, Defendants "contradicted [Plaintiffs'] version of the facts at every turn." *Id.* (quoting *Berryman v. Rieger*, 150 F.3d 561, 564 (6th Cir. 1998)). As the Sixth Circuit elaborated, Defendants' entire argument was premised on the court "believ[ing] [their] version of the facts." *Id.* (same). Such "determinations of evidence sufficiency," according to the Sixth Circuit, could

be made independent of Plaintiffs' claims. *Id.* (quoting *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)). And the case's grounding in qualified immunity, the Sixth circuit held, did not change the calculus. *Id.* (same).

**D.**

Based on new information learned during discovery, in March 2021, Plaintiffs filed a third amended complaint making three substantive changes: (1) adding Count IV for intentional infliction of emotional distress; (2) adding Defendant Simon and naming him in Counts II, III, and IV; and (3) adding Defendants Arndt, Lambert, Lewis, Lubelan, McComb, Miller, Simon, and Sosinki to Count IV. ECF No. 44. Defendants answered in April 2021. ECF No. 50. On August 3, 2021, the parties stipulated to adjourn the dispositive-motion deadline for four months (i.e., to December 3, 2021). ECF No. 56. Meanwhile, the parties continued discovery.

Four months later, on the dispositive-motion deadline, Defendants filed a motion for leave to file a second motion for summary judgment, as required by Local Rule 7.1(b)(2). ECF No. 59. For lack of good cause, this Court denied Defendants' Motion for Leave and permitted Defendant Simon to file a motion for summary judgment as the claims related to only him. *Thomas v. Lambert*, No. 1:19-CV-11046, 2022 WL 433155 (E.D. Mich. Feb. 11, 2022); ECF No. 67. Fourteen days later, Defendants filed a motion for reconsideration, which was also denied. *Thomas v. Lambert*, No. 1:19-CV-11046, 2022 WL 909344 (E.D. Mich. Mar. 28, 2022); ECF Nos. 68; 72. As permitted, Defendant Simon filed a motion for summary judgment, ECF No. 69, which was also denied, *Thomas v. Lambert*, No. 1:19-CV-11046, 2022 WL 1274950 (E.D. Mich. Apr. 28, 2022). Defendants also collectively filed a motion to extend the deadline to file motions challenging experts, ECF No. 75, which was granted, *Thomas*, 2022 WL 1274950.

In May 2022, Defendants filed a *Daubert* motion challenging two of Plaintiffs' expert witnesses. ECF No. 77. Plaintiffs have replied to that Motion. ECF No. 78. As explained hereafter, Defendants' *Daubert* motion will be denied.

## II.

Relying on the seminal case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendants seek to exclude the testimony of Plaintiffs' experts as violating all four subsections of Federal Rule of Evidence 702. *See* ECF No. 77 at PageID.1435–40.

### A.

Expert witnesses provide opinion testimony that is beyond the ken of a normal juror. *E.g.*, Suzanne Kessler, Romana DeSalvo & Sara Ellis, *Bringing Blurred Lines into Focus*, 3 BELMONT L. REV. 103, 116 (2016) (noting that experts were admitted to "explain why [two songs] are alike, and then the jury hear[d] it for themselves" in *Williams v. Bridgeport Music, Inc.*, No. LA CV13-06004 JAK, 2014 WL 7877773, at *1 (C.D. Cal. Oct. 30, 2014)) (statement of Romana DeSalvo).

For an opinion witnesses' testimony to be admissible, it must satisfy Federal Rule of Evidence 702, which governs as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>   (b) the testimony is based on sufficient facts or data;
>   (c) the testimony is the product of reliable principles and methods; and
>   (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

Rule 702 assigns the district court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand"—a kind of "gatekeeping role." *Daubert*, 509 U.S. at 597. To determine whether an expert's opinions are reliable, district courts

consider several factors that the *Daubert* Court identified, including whether the expert's methods are testable and subject to peer review. *Id.* at 593–94; *see also United States v. Bonds*, 12 F.3d 540, 558 (6th Cir. 1993) (identifying and discussing the so-called "*Daubert* factors").

The *Daubert* factors "do not constitute 'a definitive checklist or test" and do not apply in every case. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999). "Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.* at 142; *see also Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007) ("The gatekeeping inquiry is context-specific and 'must be tied to the facts of a particular case.'" (quoting *Kumho Tire*, 526 U.S. at 142)).

The crux of the expert-witness analysis is "whether a putative expert's testimony would be inadmissible junk science or instead would be testimony falling within the 'range where experts might reasonably differ.'" *See Thomas v. Novartis Pharms. Corp.*, 443 F. App'x 58, 60 (6th Cir. 2011) (unpublished) (quoting *Kumho Tire*, 526 U.S. at 153 (1999)).

An expert's "[q]ualifications must provide a foundation for an expert to answer the specific question[s]" in the expert report. *See Smith v. Nexus RVs, LLC*, 472 F. Supp. 3d 470, 480 (N.D. Ind. 2020) (citing *Gayton v. McCoy*, 593 F.3d 610, 617–18 (7th Cir. 2010)).

That foundation can come from an expert's experience or other technical knowledge. "Determining where experience-based opinion falls on this spectrum [between lay and expert testimony] has proven particularly challenging to the courts." Anne Bowen Poulin, *Experience-Based Opinion Testimony: Strengthening the Lay Opinion Rule*, 39 PEPP. L. REV. 551, 553 (2012). Yet, as the Court correctly observed, often no clear line can be drawn separating expertise based on "science" on the one hand, and that based on "technical or other specialized"

knowledge on the other. *Kumho Tire*, 526 U.S. at 148. Thus, regardless of the nature of the expert testimony, Rule 702 "establishes a standard of evidentiary reliability" requiring "a valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 149 (quoting *Daubert*, 509 U.S. at 590, 592). "And whe[n] such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question," the Court added, "the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* (quoting *Daubert*, 509 U.S. at 592).

Federal Rule of Evidence 703 governs the bases of experts' opinion testimony as follows:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

FED. R. EVID. 703.

Federal Rule of Evidence 703 identifies three types of evidence upon which an expert's opinion may be based: (1) "firsthand observation of the witness"; (2) evidence presented at the trial; and (3) "data [presented] to the expert outside of court and other than by his own perception." FED. R. EVID. 703 advisory committee's note to 1972 proposed rules.

Although an expert's opinion is not admissible if it is speculative or mere guess work, the court should admit expert testimony if it has a reasonable factual basis. *See United States v. Ramer*, 883 F.3d 659, 680 (6th Cir. 2018) (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)). In such a circumstance, "any remaining challenges merely go to the weight, as opposed to the admissibility, of the expert testimony." *Id.* (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008)). Federal Rule 703 allows an expert witness to testify to an

opinion that is supported by inadmissible hearsay evidence. *United States v. Scott*, 716 F. App'x 477, 485 (6th Cir. 2017) (unpublished).

A remaining difficulty in expert-opinion cases is whether "the analysis of a specific application is a question of weight for the jury or a question of admissibility for the judge." Shelley Storer, Note, *The Weight Versus Admissibility Dilemma:* Daubert*'s Applicability to A Method or Procedure in A Particular Case*, 1998 U. ILL. L. REV. 231, 233 (1998). Admissibility, the more difficult inquiry, hinges on an amalgam of experts' qualifications, the topic of discussion, the basis of the experts' knowledge on that topic, and the reliability of the methodology that the experts applied in reaching their opinions. But if the court finds that it is more likely than not that the experts have reliably applied the underlying methodology to the facts of the case, then any argument contesting the substance of the experts' opinion is a matter for the jury to decide: the evidence's "weight," in a word.

The qualifications of Marty G. Bugbee and Andrew g. Scott III will be discussed first, *infra* Section II.B.1, followed by the reliability of their opinion testimony, *infra* Section II.B.2, and then the scope of their testimony, *infra* Section II.B.3.

**B.**

Defendants seek to preclude the testimony of Mr. Marty Bugbee. As Defendants note, Plaintiffs will offer Bugbee's testimony to discuss the reasonability of Defendants' investigation of this case and their execution of the warrant to arrest DF. ECF No. 77 at PageID.1426.

**1.**

Bugbee has the knowledge, experience, and training to testify about police investigations and the execution of search and arrest warrants. FED. R. EVID. 702. For more than two decades, Bugbee was a task-force commander for the Michigan State Police (MSP) where he was a

supervisor, sergeant, shift commander, internal-affairs investigator, as well as a developer of intelligence programs. *See* ECF No. 77-1 at PageID.1444–45, 1481. For nearly two decades, Bugbee was also a special agent with the Air Force Office of Special Investigations where he "coordinated the delivery of multiple courses in advance investigative techniques and anti-terrorism and intelligence programs" for, among other things, national-defense operations. *See id.* at PageID.1444, 1481. In other words, Bugbee has more than 40 years' personal experience in law-enforcement operations, investigations, and procedures. And for the last decade, he has been the President and Founder of Investigative Intelligence Group, a position which led to the Supreme Court of the United States recognizing him as an expert in police procedures. *Id.* at PageID.1481. Suffice it to say, Bugbee is well qualified to testify about the proper techniques and reasonability of police investigations, executing search and arrest warrants, and detaining suspects.

Defendants challenge Bugbee's experience as not specialized in the "ES Team execution of high-risk search warrants." ECF No. 77 at PageID.1425; *see also* FED. R. EVID. 702(a).

But that argument misses the mark. The constitutionality of a search or arrest does not vary by which governmental entity conducted the search or arrest. Indeed, it would offend the Fourth Amendment to say that the constitutional implications of the same arrest should be judged by different standards depending on whether it was executed by a patrol officer, a detective, or an entire SWAT Team. This case is not about whether the ES Team acted reasonably *qua* an ES Team; it is about whether the ES Team's investigative techniques, use of force, and detention were reasonable under the circumstances. Bugbee's lack of specific experience with ES Teams is superfluous to that conclusion. Even so, Defendants have not demonstrated how Bugbee's' experience commanding an entire task force of the Michigan State Police does not qualify him to testify about the operations of the Michigan State Police's Emergency Support Team.

Further, numerous courts have rejected a requirement for highly specific specializations for expert witnesses. *See Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) ("Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility."); *James T. Scatuorchio Racing Stable, LLC v. Walmac Stud Mgmt.*, No. CIV.A. 5:11-374-DCR, 2014 WL 1664263, at *7 (E.D. Ky. Apr. 25, 2014) (collecting cases).

In *Champion v. Outlook Nashville, Inc.*, the Sixth Circuit rejected the police-officer defendants' similar argument that the plaintiffs' expert failed to present specialized knowledge that was reliable or of any assistance to the jury. 380 F.3d 893, 907–09 (6th Cir. 2004) ("We did not hold [in *Berry*] that that an individual cannot ever testify as an expert about some aspect of police affairs. Rather, the holding in *Berry* reasoned that unqualified individuals could not broadly testify about an area in which they possessed no specialized knowledge."). Further, the *Champion* panel determined that the plaintiff's police-practice expert had "extensive and substantial" credentials and testified about specific areas of police practice. *Id.* The *Champion* panel distinguished the expert from *Berry*, who was appointed but fired, twice, from his position as chief of police, had no formal training or experience in policing or criminology, and failed to review the underlying facts supporting his opinions. *Id.* at 908; *see Berry*, 25 F.3d at 1352. Plaintiffs' experts, like the expert in *Champion*, are qualified, knowledgeable, and experienced in police practices, and their testimony would assist the jury's factual determinations.

Similarly, Andrew Scott has the requisite specialized knowledge, experience, training, and education to testify as an opinion witness. Scott has been pursuing a doctorate in criminal justice since 2018 and graduated from the Federal Bureau of Investigation's (FBI) National Academy. ECF No. 77-2 at PageID.1500. After a 17-year climb of the police-officer ladder from patrolman

to sergeant to lieutenant, he served as the Assistant Chief of Police of North Miami Beach, Florida for more than three years. *Id.* at PageID.1504–05. Scott then became the Chief of Police of Boca Raton, Florida—a position that he held for nearly 20 years. *See id.* at PageID.1502–03. In those roles, among other things, he supervised nearly 200 sworn police officers, developed policing programs and techniques, and received national recognition for the model policies that he developed, some of which were adopted by the International Association of Chiefs of Police (IACP). *See id.* at PageID.1502. Now, Scott is the President of AJS Consulting, which specializes in security-team deployments, the development and review of law-enforcement policies and procedures, and security assessments. *Id.* at PageID.1500–01. Defendants do not raise any significant reason to question Scott's experience and knowledge of police practices, especially as to whether the ES Team's investigative techniques, use of force, and detention were reasonable under the circumstances.

### 2.

The opinions of both experts are based on sufficient facts and data, and they reliably apply reliable principles and methods to the facts of this case.

Bugbee has relied on a procedural manual from the MSP Training Academy, the MSP's official orders, and three model policy papers from the IACP, as well as his knowledge, training, and experience. ECF No. 77-1 at PageID.1446, 1448 n.1, 1456 n.2. Those documents "represent how a trained and experienced law enforcement officer should act in the performance of their duties." *Id.* at PageID.1446. And he applied the policing practices in those manuals to the facts of this case. *See id.* at PageID.1447–80. Moreover, he explained how he applied those methodologies to the facts of this case. *See id.* at PageID.1446 ("I looked at the available materials, identified the applicable standards, and identified material deviations, if any. For each item of evidence, both for

and against my opinions, I placed appropriate weight on the evidence in reaching my conclusions. I then assimilated this information with the testimony and reports of the other experts to come to my individual conclusions and overall conclusions."). Finally, the conclusions that he has drawn reasonably follow from his analysis. *See id.* at PageID.1480 ("[I]t is my opinion that . . . the police departed from any acceptable method or practice of arrest and search procedure. Enforcement members also violated the Official Orders of The Michigan State Police, in the course of this investigation.").

Scott has similarly relied on two model policy papers from the IASP, papers from the National Tactical Officers Association, information from the Police Executive Research Forum, and his "30 years of law enforcement experience, knowledge, and training." ECF No. 77-2 at PageID.1491, 1494, 1498–99. As explained earlier, those principles and methods are reliable. Further, with a very detailed analysis, Scott applied the policing practices in those manuals to the facts of this case. *See id.* at PageID.1485–99. Finally, the conclusions that he has drawn reasonably follow from his analysis. *See, e.g.*, *id.* at PageID.1491 ("The Michigan State Police (MSP) did not have reasonable suspicion to believe that Ms. Thomas and her three children had committed, were committing, or were about to commit a crime warranting an investigative detention."); *id.* at PageID.1494 ("Similarly unreasonable and unjustified was the treatment of Ms. Thomas' children during the encounter. The actions of the Michigan State E.S. Team were contrary to well-established police practices and procedures.").

Defendants cite no legal authority in contest and only make conclusory arguments. For example, with no legal support, Defendants argue that Plaintiffs' experts impermissibly "lump together all Defendants for every opinion, which suggests insufficient facts of data for any Defendant-specific opinion." ECF No. 77 at PageID.1439.

Defendants' arguments do not contest the admissibility of Plaintiffs' experts' opinions; they merely contest the soundness of Plaintiffs' experts' conclusions, which are matters of credibility for the jury. "[M]ere weaknesses in the factual basis of an expert witness' opinion bear on the weight of the evidence rather than on its admissibility." *McLean v. 988011 Ont., Ltd.*, 224 F.3d 797, 800–01 (6th Cir. 2000) (internal quotation marks and citations omitted). Indeed, arguments related to "contrary evidence" or "incompleteness" go to the weight of the evidence rather than its admissibility and are, therefore, properly rejected at this juncture. *United States v. Lang*, 717 F. App'x 523, 536 (6th Cir. 2017) (unpublished) ("Although Rule 702 does not require an expert to consider *all* the facts and data available, it does require the factual basis of his opinion to be *sufficient*."); *see also Daubert*, at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." (citation omitted)); *Whirlpool Props. v. LG Elecs. U.S.A., Inc.*, No. 1:03 CV 414, 2006 WL 62846, at *4 (W.D. Mich. Jan. 10, 2006) ("Selection of an inappropriate universe generally affects the weight of the resulting data, not its admissibility.") (citation omitted).

On cross-examination, Defendants may explore Bugbee's and Scott's conclusions as they relate to each Defendant.

### 3.

Notably, due to timing, it is reasonable to assume that Plaintiffs' experts developed their testimony specifically for litigation, giving rise to concerns about reliability. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 593–94 (1993); *Lust ex rel. Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 597 (9th Cir. 1996). But as explained above, their methods were reliable and well recognized in the law-enforcement community. *See* discussion *supra* Sections II.B.1, II.B.2. And

Defendants have not offered any evidence to counter the reliability of Plaintiffs' proposed experts. *See Lust*, 89 F.3d at 598. The testimony of Plaintiffs' experts is therefore reliable.

Having established that Plaintiffs' experts have a reliable basis for their opinion testimony, Defendants' remaining concerns, including the weight and reliability of their conclusions, are relevant to only the weight of the testimony and should be raised, if at all, on cross-examination. *See In re E. I. Du Pont De Nemours & Co. C-8 Pers. Inj. Litig.*, 337 F. Supp. 3d 728, 738 (S.D. Ohio 2015) (noting that the *Daubert* inquiry is "not intended to supplant the adversary system or the role of the jury," and that "[a]rguments regarding the weight to be given any testimony or opinions of an expert witness are properly left to the jury" (citing *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 531–32 (6th Cir. 2008))).

Importantly, however, Plaintiffs' experts may not spoon-feed the jury conclusions that it could reach on its own. Indeed, "testimony that does no more than 'tell the jury what result to reach . . . hardly can be viewed as being helpful to the jury.'" *Good v. BioLife Plasma Servs., L.P.*, No. 1:18-CV-11260, 2022 WL 188125, at *6 (E.D. Mich. Jan. 19, 2022) (quoting *Jesa Enters. v. Thermoflex Corp.*, 268 F. Supp. 3d 968, 973 (E.D. Mich. 2017)).

In the § 1983 context, the reasonability and scope of searches and seizures are questions of fact. *See, e.g.*, Duncan v. Jackson, 243 F. App'x 890, 896 (6th Cir. 2007) (unpublished); *see also Gardenhire v. Schubert*, 205 F.3d 303, 312 (6th Cir. 2000) (citing *Painter v. Robertson*, 185 F.3d 557, 569 (6th Cir. 1999)) ("[T]he question of whether there was probable cause for an arrest is a mixed question of law and fact."). Determinations of reasonable suspicion and probable cause are also questions of fact. *See Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). The same is true of exceptions to the warrant requirement. *United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999) (collecting cases regarding the consent exception); *see Schneckloth v. Bustamonte*, 412

U.S. 218, 227 (1973) ("[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."); *accord United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008) (quoting *Bustamonte*, 412 U.S. at 227); *see also United States v. Blomquist*, 976 F.3d 755, 758-59 (6th Cir. 2020) ("The government bears the burden of demonstrating by a preponderance of the evidence, through clear and positive testimony, that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." (quoting *United States v. Alexander*, 954 F.3d 910, 918 (6th Cir. 2020))). The same is true regarding the scope of consent. *See United States v. Garrido-Santana*, 360 F.3d 565, 570 (6th Cir. 2004).

The ultimate issue of fact in this case is whether Defendants violated the Fourth Amendment when they executed the search warrant for DF, destroyed Plaintiffs' home, and then detained them. Whether their conduct was reasonable, justified, or "exceeded their authority and violated MSP's official orders" is therefore permissible opinion testimony. *See* ECF No. 77 at PageID.1437–38.

Numerous federal courts have permitted opinion testimony of police-practice experts to use terms like "reasonable." *See, e.g.*, *Restivo v. Hessemann*, 846 F.3d 547, 580 (2d Cir. 2017) (holding that experts may testify "about what minimally accepted police practices required and about his opinion that [the officer's] conduct departed from accepted police practices"); *Gutierrez v. City of San Antonio*, 139 F.3d 441, 447 (5th Cir. 1998) ("We can still conclude, of course, that one expert accurately expresses what a reasonable police officer would do, but we are not forced to so conclude by the mere presence of an expert's opinion."); *Avila v. California*, No. 115CV00996LJOEPG, 2018 WL 836440, at *16 (E.D. Cal. Feb. 13, 2018), *as clarified on reconsideration*, No. 115CV00996LJOEPG, 2018 WL 1763250 (E.D. Cal. Apr. 12, 2018)

(explaining that the expert "may properly testify about what he or a reasonable officer would have done and why, or what best practices call for, based on his review of video, reports, statements, and best practices available"); *see also Fair v. Franklin Cnty.*, 2000 U.S. App. LEXIS 11627, at *11-12 (6th Cir. 2000) (affirming district court's admission of testimony discussing satisfaction of probable cause).

Moreover, Defendants have waived any objection to Plaintiffs' experts testifying to the reasonableness of their conduct. It is well established that the "offering of similar evidence by the objector" waives objection to the admissibility of evidence. 1 MCCORMICK ON EVIDENCE § 55 (Robert P. Mosteller et al. eds. 8th ed. 2020) (collecting cases). A party is not "permitted 'to blow hot and cold' in this way." *Id.* at n.20. Defendants have testified that their conduct was reasonable and did not violate established policing procedures. *See, e.g.*, ECF Nos. 71-2 at PageID.1094 (Defendant Simon testifying that it was "reasonable to use tear gas and BearCats and robots and stuff like that"); 59-1 at PageID.608 (Defendant Murchie testifying that he lacked probable cause to arrest Plaintiff Thomas); 59-1 at PageID.632–36 (Defendant Lubelan testifying about his belief that "driv[ing] a Bearcat into a residence" is "not an extreme step," and that they "use it more frequently now"); 59-1 at PageID.765–75 (Defendant Sosinski testifying that Defendants "went a little above normal on that one," that it "went a little longer," that the officers were not sure whether DF was in the house that day, that Plaintiffs swore that DF was not in the house, that the damage the officers caused was "necessary and reasonable" and "not just about finding the person").

For these reasons, Bugbee and Scott may testify about the reasonableness of Defendants' conduct and whether it accorded with standing police policies or permissible policing standards. Neither expert may testify about whether Defendants' conduct violated the Fourth Amendment, but they may "state opinions that suggest the answer to the ultimate issue or that give the jury all

the information from which it can draw inferences as to the ultimate issue." *United States v. Maya*, 966 F.3d 493, 506 (6th Cir. 2020) (cleaned up) (quoting *United States v. Volkman*, 797 F.3d 377, 382 (6th Cir. 2015)); *see also Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) (collecting cases).

Consequently, Defendant's *Daubert* Motion will be denied, and Marty Bugbee and Andrew Scott may testify consistent with this Opinion and subject to further order of this Court.

### III.

Accordingly, it is **ORDERED** that Defendants' Motion to Exclude Expert Testimony, ECF No. 77, is **DENIED**.

Dated: June 9, 2022                    s/Thomas L. Ludington
                                                   THOMAS L. LUDINGTON
                                                   United States District Judge